Anton Ewing
3077 B Clairemont Drive #372
San Diego, CA 92117
(619) 719-9640
anton@antonewing.com

Plaintiff in Pro Per

**FILED**

Dec 27 2018

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY          s/ L.Illianac          DEPUTY

# THE UNITED STATES FEDERAL DISTRICT COURT

# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| Anton Ewing, an individual,<br><br>Plaintiff,<br><br>vs.<br><br>National Insurance USA Group, LLC, a Wisconsin Limited Liability Company;<br><br>Steve Erlich, an individual and officer of National Insurance USA Group, LLC, aka Steven Erlich;<br><br>Apollo Marcos Arcallana, an individual and officer of National Insurance USA Group, LLC;<br><br>Matthew Alan Palacios Bagley, an individual, aka Matt Bagley Palacios,<br><br>Defendants. | Civil Case No. **'18CV2889 AJB BLM**<br><br>**COMPLAINT**<br><br>**TCPA 47 USC §227(b)(1)(A)**<br>**TCPA 47 USC §227(c)(5)**<br>**CIPA PC §637.2 and §632.7** |

PLAINTIFF'S COMPLAINT FOR VIOLATIONS UNDER TCPA - 1

18CV

May it please the Court, Plaintiff Anton Ewing (herein "Plaintiff" or "Ewing"), for this complaint against Defendant National Insurance USA Group, LLC, a Wisconsin Limited Liability Company and its present, former and future direct and indirect parent companies, subsidiaries, and affiliatess (herein "National Insurance"), Steve Erlich, an individual and officer of National Insurance USA Group, LLC (herein "Erlich") aka Steven Erlich, as well as Apollo Marcos Arcallana, an individual and officer of National Insurance (herein "Arcallana"), and Matthew Alan Palacios Bagley, an individual aka Matt Bagley Palacios (herein "Bagley"), alleges as follows:

## I.   INTRODUCTION

1.     The TCPA causes of action (47 USC §227(b) and (c)) filed herein for, *inter alia*, illegal telemarketing to Plaintiff's DNC registered cellular phone and home phone through the use of an ATDS is expressly alleged against Defendants National Insurance USA Group, LLC and its present, former and future direct and indirect parent companies, subsidiaries, and affiliates, Steve Erlich, an individual and officer of National Insurance USA Group, LLC, Apollo Marcos Arcallana, an individual and an officer of National Insurance, and Matthew Alan Palacios Bagley, an individual aka Matt Bagley Palacios.

2.     The CIPA cause of action (PC §§§632, 637.2, 632.7) filed herein for illegal recording of the telemarketing call to Plaintiff's phone without disclosure of the

18CV

recording is alleged against Defendants National Insurance USA Group, LLC and its present, former and future direct and indirect parent companies, subsidiaries, affiliates and agents, Steve Erlich, an individual and officer of National Insurance USA Group, LLC, Apollo Marcos Arcallana, an individual and an officer of National Insurance and Matthew Alan Palacios Bagley, an individual aka Matt Bagley Palacios.

3.    Nature of Action. Something is rotten in Wisconsin, to wit: National Insurance USA Group, LLC, Erlich, Bagley and Arcallana, working together and in concert, have been bombarding Mr. Ewing, without his consent, with autodialed and prerecorded calls ("robocalls") as well as "live-transfer" calls using an ATDS at defined by the 9th Circuit in the *Crunch* case.. Mr. Ewing begged National Insurance, Erlich, Bagley and Arcallana to stop these illegal calls, but since then, Defendant National Insurance and its hired and controlled agents have robocalled Plaintiff dozens more times.  Mr. Ewing brings this action under the Telephone Consumer Protection Act, 47 U.S.C. § 227 ("TCPA"), in hopes that an injunction and damages will encourage National Insurance, Erlich, Bagley and Arcallana to change their ways.

4.    Arcallana was previously sued in federal court for TCPA violations.  See 1:10-cv-01420-PAB-BNB District of Colorado.

5.    Bagley currently has an arrest warrant pending in the Northern District of

18CV

Georgia as criminal case number 1:18-MJ-954 for illegal telemarketing activity,

money laundering and conspiracy.  FBI Special Agent Gregory Peacock signed the

affidavit to support the criminal complaint.

## II. PARTIES

6.      Plaintiff Anton Ewing is a citizen of California who conducts business in

California, in this District.

7.      Defendant National Insurance USA Group, LLC is a limited liability

company organized under the laws of the State of Wisconsin with its principal

place of business at 863 La Senda Way, Chula Vista, CA 91910.  National

Insurance does business in this District and throughout the United States.

8.      Steve Erlich is the president, CEO, Manager, shareholder, director, officer,

and alter ego of National Insurance.  Erlich does not respect the National Insurance

formalities of entity operation and therefore he is not protected by its veil.  Erlich

is a citizen of Florida.

9.      Apollo Marcos Arcallana, is an individual, employee and agent of National

Insurance.  During 2018, Arcallana performed telemarketing activities by, for and

on behalf of National Insurance and knowingly directed Erlich to set up a call

center to robo-dial DNC protected numbers with a prerecorded message for

Medicare insurance relief.  Arcallana owns, controls and uses phone number 619-

636-5280 to engage in his scam telemarketing on behalf of his employer, National

Insurance.  Arcallana is a citizen of California and he stated, in writing, that he is an owner of National Insurance.

10.     National Insurance is Arcallana's LLC in Wisconsin that he uses to receive and launder his illegal telemarketing revenues and gains.

11.     Erlich stated to Plaintiff that they are calling "millions of phone number over and over."  Erlich uses a Vicidial system with an artificial intelligence robot to make the calls and walk the victim through their script and into their Medicare scam.  The level of sophistication of the racketeering operation is mind-blowing.

### III. JURISDICTION AND VENUE

12.     <u>Jurisdiction</u>. This Court has federal-question subject matter jurisdiction over the Plaintiff's TCPA claims pursuant to 28 U.S.C. § 1331 because the TCPA is a federal statute. *Mims v. Arrow Fin. Servs., LLC*, 565 U.S. 368, 372 (2012). This Court has supplemental subject matter jurisdiction over the Plaintiffs' claim arising under California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code §§ 17200 *et seq.*, Civil Code §1770(a)(22)(A),  and California Invasion of Privacy Act, Penal Code §637.2, §632.7 because those claims:

      a.  arises from the same nucleus of operative fact, i.e., Defendant's telemarketing robocalls to Plaintiff;

      b.  adds little complexity to the case; and

      c.  relies on the same nucleus of facts, so it's unlikely to predominate

over the TCPA claims.

13.   <u>Personal Jurisdiction.</u> This Court has personal jurisdiction over NATIONAL INSURANCE because a substantial part of the wrongful acts alleged in this Complaint were committed in California. For example, NATIONAL INSURANCE made illegal telemarketing robocalls to Mr. Ewing, while he was in California.   Erlich, who is the officer, director, member and manager of NATIONAL INSURANCE, has also subjected himself to personal jurisdiction in California because he is running said criminal operation.  It is a crime to violate 47 USC §501 by violating 47 USC §227(b).  Erlich, through his LLC, National Insurance, initiated the primary telemarketing calls to Plaintiff and then sold, transferred and provided the lead to Arcallana and others in a knowingly illegal manner.  California Civil Code §1770(a)(22)(A) expressly prohibits the prerecorded messages that Arcallana and Erlich sent to Plaintiff.

14.   Plaintiff was called four times beginning on or about December 12, 13 and 26, 2017, from 708-586-8212, and 954-670-8118, numbers owned, used and controlled by Erlich and National Insurance, with a prerecorded message that stated *"Hello, my name is Justin and I am calling from the Medicare Specialists…"* and then "Justin" came on the line and introduced himself as being with "Medicare Center."  After many personal questions were asked and answered, Justin transferred the call to National Insurance.  Tom Pankel eventually came on the

phone and said his number was 855-230-0801 and that he was in Florida.

15.     Plaintiff received another robo call with a prerecorded message from "Medicare center" and then Tom came on the line.

16.     "Where, as here, there is no applicable federal statute governing personal jurisdiction, the district court applies the law of the state in which the district court sits." *Yahoo! Inc. v. La Ligue Contre Le Racisme Et L'Antisemitisme*, 433 F.3d 1199, 1205 (9th Cir. 2006); *Panavision Intern., L.P. v. Toeppen*, 141 F.3d 1316, 1320 (9th Cir. 1998). "Because California's long-arm jurisdictional statute is coextensive with federal due process requirements, the jurisdiction analyses under state law and federal due process are the same." *Yahoo!*, 433 F.3d at 1205 (citing *Panavision*, 141 F.3d at 1320).  Due process requires that Defendants must have minimum contacts with the forum such that the assertion of jurisdiction in that forum "'does not offend traditional notions of fair play and substantial justice.'" *Pebble Beach Co. v. Caddy*, 453 F.3d 1151, 1155 (9th Cir. 2005) (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 315, 66 S. Ct. 154, 90 L. Ed. 95 (1945)).

17.     There are two types of personal jurisdiction: general and specific. *Daimler AG v. Bauman*, 134 S. Ct. 746, 754-55, 187 L. Ed. 2d 624 (2014). "For general jurisdiction to exist over a nonresident defendant . . . , the defendant must engage in 'continuous and systematic general business contacts,' that 'approximate physical presence' in the forum state." *Schwarzenegger v. Fred Martin Motor Co.*, 374 F.3d

797, 801 (9th Cir. 2004) (quoting *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 416, 104 S. Ct. 1868, 80 L. Ed. 2d 404 (1984); *Bancroft & Masters, Inc. v. Augusta Nat'l, Inc.*, 223 F.3d 1082, 1086 (9th Cir. 2000)) (internal citations omitted).  To establish specific jurisdiction, Plaintiff must show: "(1) [t]he non-resident defendant . . . purposefully direct[ed] [its] activities or consummate[d] some transaction with the forum or resident thereof; or perform some act by which [it] purposefully avail[ed] [itself] of the privilege of conducting activities in the forum, thereby invoking the benefits and protections of its laws; (2) the claim must be one which arises out of or relates to the defendant's forum-related activities; and (3) the exercise of jurisdiction must comport with fair play and substantial justice, i.e. it must be reasonable." *Id*. at 802.  At least two courts in the 9th have found specific jurisdiction in circumstances similar to this case. One court found personal jurisdiction where the out-of-state defendant sent numerous unsolicited fax advertisements to a California-based plaintiff. *Global Commc'ns, Inc. v. Blue Jay, Inc.*, No. C 08-4254 PJH, 2009 U.S. Dist. LEXIS 1616, 2009 WL 29905, at *2, 8-10 (N.D. Cal. Jan. 5, 2009). Another court found personal jurisdiction where the defendant operated a website that the California-plaintiff used, called and emailed the plaintiff numerous times, and the plaintiff's claims arose out of those contacts. *Heidorn v. BDD Mktg. & Mfg. Co., LLC*, No. C-13-00229 JCS, 2013 U.S. Dist. LEXIS 177166, 2013 WL 6571629, at *8 (N.D. Cal. Aug. 19, 2013). *Drew v.*

*Lexington Consumer Advocacy, LLC*, No. 16-cv-00200-LB, 2016 U.S. Dist. LEXIS 52385, at *4-7 (N.D. Cal. Apr. 18, 2016)

18.     <u>Venue</u>. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(1)-(2) because a substantial part of the events giving rise to the claims occurred in this District and because Defendant Arcallana resides in, i.e., is subject to personal jurisdiction in, this District.  Moreover, NATIONAL INSURANCE is not registered with the California Secretary of State but does substantial business in this District.  NATIONAL INSURANCE has purposefully directed its activities to California and advertises that it does business in California on its web page at www.aimediaone.com.

**IV. TELEPHONE CONSUMER PROTECTION ACT, 47 U.S.C. § 227**

19.     In 1991, Congress enacted the TCPA in response to a growing number of consumer complaints regarding telemarketing.

20.     The TCPA makes it unlawful "to make any call (other than a call made for emergency purposes or made with the prior express consent of the called party) using an automatic telephone dialing system or an artificial or prerecorded voice… to any telephone number assigned to a … cellular telephone service." 47 U.S.C. §227(b)(1)(A)(iii).

21.     The TCPA makes it unlawful "to initiate any telephone call to any residential telephone line using an artificial or prerecorded voice to deliver a

message without the prior express consent of the called party, unless the call is initiated for emergency purposes, is made solely pursuant to the collection of a debt owed to or guaranteed by the United States, or is exempted by rule or order" of the Federal Communication Commission ("FCC"). 47 U.S.C. § 227(b)(1)(B).

22.    The TCPA provides a private cause of action to persons who receive calls in violation of § 227(b). 47 U.S.C. § 227(b)(3).

23.    The TCPA makes it unlawful to make telemarketing solicitations to telephone numbers on the National Do Not Call Registry. 47 U.S.C. § 227(c); 47 C.F.R. § 64.1200(c)(2).

24.    The TCPA provides a private cause of action to persons who receive calls in violation of § 227(c). 47 U.S.C. § 227(c)(5).

25.    According to findings of the FCC, the agency vested by Congress with authority to issue regulations implementing the TCPA, automated or prerecorded telephone calls are a greater nuisance and invasion of privacy than live solicitation calls and can be costly and inconvenient.

26.    The FCC also recognizes that "wireless customers are charged for incoming calls whether they pay in advance or after the minutes are used." *In re Rules and Regulations Implementing the Tel. Consumer Prot. Act of 1991*, 18 FCC Rcd. 14014, 14115 ¶ 165 (2003).

27.    The FCC requires "prior express written consent" for all autodialed or

prerecorded telemarketing robocalls to wireless numbers and residential lines. In

particular:

> [A] consumer's written consent to receive telemarketing robocalls
> must be signed and be sufficient to show that the consumer: (1)
> received clear and conspicuous disclosure of the consequences of
> providing the requested consent, *i.e.*, that the consumer will receive
> future calls that deliver prerecorded messages by or on behalf of a
> specific seller; and (2) having received this information, agrees
> unambiguously to receive such calls at a telephone number the
> consumer designates. In addition, the written agreement must be
> obtained without requiring, directly or indirectly, that the agreement
> be executed as a condition of purchasing any good or service. *In the
> Matter of Rules & Regulations Implementing the Tel. Consumer Prot.
> Act of 1991*, 27 FCC Rcd. 1830, 1844 ¶ 33 (2012) (footnote and
> internal quotation marks omitted).

28.    FCC regulations "generally establish that the party on whose behalf a

solicitation is made bears ultimate responsibility for any violations." *In the Matter

of Rules and Regulations Implementing the Tel. Consumer Prot. Act of 1991*, 10

FCC Rcd. 12391, 12397 ¶ 13 (1995).

29.    The FCC confirmed this principle in 2013, when it explained that "a seller

… may be held vicariously liable under federal common law principles of agency

for violations of either section 227(b) or section 227(c) that are committed by

third-party telemarketers." *In the Matter of the Joint Petition Filed by Dish

Network, LLC*, 28 FCC Rcd. 6574, 6574 ¶ 1 (2013).

30.    The 9th Circuit has defined an ATDS as follows: "we conclude that the

statutory definition of ATDS is not limited to devices with the capacity to call

numbers produced by a "random or sequential number generator," but also includes devices with the capacity to dial stored numbers automatically. Accordingly, we read § 227(a)(1) to provide that the term automatic telephone dialing system means equipment which has the capacity—(1) to store numbers to be called or (2) to produce numbers to be called, using a random or sequential number generator—and to dial such numbers."

31.    Senator Fritz Hollings complained, "[c]omputerized calls are the scourge of modern civilization.  They wake us up in the morning; they interrupt our dinner at night; they force the sick and elderly out of bed; they hound us until we want to rip the telephone right out of the wall." 137 Cong. Rec. S16,205 (daily ed. Nov. 7, 1991) (statement of Sen. Hollings). Recipients deemed that "automated telephone calls that deliver an artificial or prerecorded voice message are more of a nuisance and a greater invasion of privacy than calls placed by 'live' persons." S. Rep. No. 102-178, at 4.

32.    The plausibility standard 'calls for enough fact to raise a reasonable expectation that discovery will reveal evidence' of the defendant's liability." *Miyahira v. Vitacost.com, Inc.*, 715 F.3d 1257, 1265 (11th Cir. 2013) (quoting *Twombly*, 550 U.S. at 556).  The Federal Communications Commission ("FCC")— which has authority to implement the TCPA's provisions, *see* 47 U.S.C. § 227(b)(2)— has stated that a plaintiff, to establish a TCPA violation, "need only

show that [the Defendant] called a number assigned to a cellular telephone service using an automatic dialing system or prerecorded voice." *Breslow v. Wells Fargo Bank, N.A.*, 857 F. Supp. 2d 1316, 1319 (S.D. Fla. 2012).  Because the Defendants have violated multiple subsections of 47 U.S.C. §227, including but not limited to 47 U.S.C. §227(b)(1)(A) and §227(c), then Defendants, and each of them, have committed the criminal violation of 47 U.S.C. §501.

33.    "[P]rior express consent is an affirmative defense, not an element of the claim," meaning a plaintiff "need not plead that he did not give his prior express consent." *Manfred v. Bennett Law, PLLC*, No. 12–CV–61548, 2012 WL 6102071, at *2 (S.D. Fla. Dec. 7, 2012).  Rather, "[t]he only thing [a] [p]laintiff must plead to establish a violation of the TCPA is that the [d]efendants left voicemail messages at a number assigned to a cellular telephone service using an automatic dialing system or an artificial or pre-recorded voice." Id. (denying motion to dismiss for failure to state a claim where the plaintiff alleged "that [the] [d]efendants used an Automatic Telephone Dialing System or an artificial or pre-recorded voice to place the telephone calls to [the] [p]laintiff's cellular phone.").

34.    Plaintiff Ewing alleges that Defendants Erlich, NATIONAL INSURANCE, Arcallana and Bagley placed repeated automated telephone calls to Plaintiff Ewing's cell phone (619-719-9640) and home phone (619-798-2016) from their phones and that the calls exhibited signs of being made with an Automated

Telephone Dialing System, including repeated telemarketing calls to Plaintiff Ewing within a period of time in December 2018 and the presence of a pause or click (which is proven by the recording), which is commonly associated with an Automated Telephone Dialing System (ATDS). Those allegations are true and are sufficient to establish the elements of a TCPA claim. Defendant NATIONAL INSURANCE's telemarketing agent also admitted on the call that they used an ATDS to initiate the dialing of the calls to Plaintiff Ewing.

35.    ABC, Inc (a Doe Defendant to be named after discovery reveals the same) that was hired by NATIONAL INSURANCE and Erlich to knowingly and intentionally make robo-dialed calls to Plaintiff Ewing with a pre-recorded voice message that was used for telemarketing purposes between June 30, 2018 and December 27, 2018. ABC, Inc has subsequently made illegal telemarketing calls to Ewing and discovery may very well lead to adding ABC, Inc as a defendant herein. Upon information and belief, Bagley is using a Panamanian company, also registered in Canada, called AI Media 1, Inc. to run his telemarketing scam.

36.    California Civil Code section 1770(a)(22)(A) prohibits prerecorded telemarketing messages without advance written consent and Plaintiff provided no such consent.

37.    As Judge Easterbrook of the Seventh Circuit recently explained in a TCPA case regarding calls to a non-debtor similar to this one:

> The Telephone Consumer Protection Act...is well known for
> its provisions limiting junk-fax transmissions.  A less-litigated
> part of the Act curtails the use of automated dialers and
> prerecorded messages to cell phones, whose subscribers often
> are billed by the minute as soon as the call is answered--and
> routing a call to voicemail counts as answering the call.  An
> automated call to a landline phone can be an annoyance; an
> automated call to a cell phone adds expense to annoyance.
> *Soppet v. Enhanced Recovery Co., LLC, 679 F.3d 637, 638 (7th Cir. 2012)*

38.     As the Court unanimously held in *Haines v. Kerner*, 404 U.S. 519 (1972), a

pro se complaint, "however inartfully pleaded," must be held to "less stringent

standards than formal pleadings drafted by lawyers" and can only be dismissed for

failure to state a claim if it appears "'beyond doubt that the plaintiff can prove no

set of facts in support of his claim which would entitle him to relief.'" Id., at 520-

521, quoting *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957)." *Estelle v.*

*Gamble* (1976) 429 U.S. 97, 106 [97 S.Ct. 285, 292, 50 L.Ed.2d 251, 261].

## V. STANDING

39.     The court must evaluate lack of statutory standing under the Rule 12(b)(6)

standard. *Maya v. Centex Corp.*, 658 F.3d 1060, 1067 (9th Cir. 2011).  However,

because Plaintiff is proceeding pro se, his complaint "must be held to less stringent

standards than formal pleadings drafted by lawyers" and must be "liberally

construed." *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (per curiam) (reaffirming

standard reviewing pro se complaints post-*Twombly*). The Ninth Circuit has

concluded that the court's treatment of pro se filings after *Twombly* and *Iqbal*

remain the same and pro se pleadings must continue to be liberally construed.

*Hebbe v. Pliler*, 627 F.3d 338, 342 (9th Cir. 2010); see also *McGowan v. Hulick*,

612 F.3d 636, 640-42 (7th Cir. 2010); *Bustos v. Martini Club Inc.*, 599 F.3d 458,

461-62 (5th Cir. 2010); *Harris v. Mills*, 572 F.3d 66, 71-72 (2d Cir. 2009) (noting

that even following *Twombly* and *Iqbal*, "we remain obligated to construe a pro se

complaint liberally").

40.    Standing is proper under Article III of the Constitution of the United States

of America because Plaintiff's claims state:

    A. A valid injury in fact;

    B. which is traceable to the conduct of Defendants;

    C. and is likely to be redressed by a favorable judicial decision.  See,

        *Spokeo, Inc. v. Robins*, 578 U.S.____(2016) at 6, and *Lujan v. Defenders*

        *of Wildlife*, 504 U.S. 555 at 560.  In order to meet the standard laid out in

        *Spokeo* and *Lujan*, Plaintiffs must clearly allege facts demonstrating all

        three prongs above.

**The "Injury in Fact" Prong.**

41.    Plaintiff's injury in fact, must be both "concrete" and "particularized" in

order to satisfy the requirements of Article III of the Constitution, as laid out in

*Spokeo* (Id.). For an injury to be "concrete," it must be a de facto injury, meaning

that it actually exists.  In the present case, Plaintiff was called on his cellular phone

at least four (5) times by Defendants.  In fact, Plaintiff expressly informed

Defendants to cease and desist from all future telemarketing on the very first call.

Such calls are a nuisance, an invasion of privacy, and an expense to Plaintiff in

multiple ways. *Soppet v. Enhanced Recovery Co., LLC*, 679 F.3d 637, 638 (7th Cir.

2012). Defendant's invasion of Plaintiff's right to privacy is further exacerbated by

the fact that Plaintiff's phone number, at all times relevant to this litigation, was on

the National Do-Not-Call Registry ( hereinafter, "DNC Registry"). As well,

Plaintiff had no prior business relationship with Defendants prior to receiving the

seriously harassing and annoying calls as well as the extortionate threats by Erlich

and by Arcallana.   All of Plaintiff's injuries are concrete and de facto. For an

injury to be "particularized" means that the injury must "affect the plaintiff in a

personal and individual way." *Spokeo, Inc. v. Robins,* 135 S.Ct. 1540, *578 U.S. ___*

*(2016) at* 14.  In the instant case, it was Plaintiff's phone that was called and it was

Plaintiff who answered the calls.  It was Plaintiff's personal privacy and peace that

was invaded by Defendant's persistent phone calls using an ATDS and a pre-

recoded message, despite Plaintiff having no prior business relationship with

Defendants and Plaintiff's attempt to avoid the damage by registering his number

on the DNC Registry.  Additionally, Plaintiff Ewing has a clear warning on each

and every page of his web domain that warns offenders that if you call, you will be

sued.  In fact, Ewing had to remove his own phone number from his web page

several years ago (please go ahead and verify this on the waybackmachine[1]) due

the incessant, annoying and harassing calls by scam telemarketers like these

defendants.  Moreover, a simple Google search of Ewing's phone number will

yield page after page of warnings that threaten a civil suit if you call.  And, Ewing

has sent out hundreds of emails to TCPA defense attorneys nationwide warning

them that if their clients call Ewing's phone, they will be sued.  Finally, Plaintiff is

responsible to pay the bill on his cellular phone, and to pay the bill for the electric

utility company kilowatt-hour power usage to recharge it. All of these injuries are

particularized and specific to Plaintiff and will be the same injuries suffered by

Plaintiff.

**The "Traceable to the Conduct of Defendants" Prong**

42.    The second prong required to establish standing at the pleadings phase is

that Plaintiff must allege facts to show that their injury is traceable to the conduct

of Defendants. In the instant case, this prong is met by the fact that the calls to

Plaintiff's cellular phone and home phone (land line) were placed either by

Defendants directly, or by Defendants' agent at the express direction and control of

Defendants.   See *Jones v. Royal Admin. Servs., 866 F.3d 1100 (9th Cir. 2017)* ten

factor test from the 9th Circuit and Civil code §2307.

---

[1] Exact copy of web page in 2015:
https://web.archive.org/web/20151109045712/http://www.antonewing.com:80/contact

**The "Injury is Likely to be Redressed by a Favorable Judicial Opinion" Prong**

43.     The third prong to establish standing at the pleadings phase requires Plaintiff to allege facts to show that the injury is likely to be redressed by a favorable judicial opinion. In the present case, Plaintiff's Prayers for Relief includes a request for damages for each call made by Defendants, as authorized by statute in 47 U.S.C. § 227. The statutory damages were set by Congress and specifically redress the financial damages suffered by Plaintiff.  Furthermore, Plaintiff's Prayers for Relief request injunctive relief to restrain Defendants from the alleged abusive practices in the future. The award of monetary damages and the order for injunctive relief redress the injuries of the past and prevent further injury in the future. Because all standing requirements of Article III of the U.S. Constitution have been met, as laid out in *Spokeo, Inc. v. Robins*, 578 U.S. ___ (2016), Plaintiff has standing to sue Defendants on the stated claims.

44.     "…[C]ourts in the Ninth Circuit have held that "allegations of nuisance and invasions of privacy in TCPA actions are concrete" injuries that establish standing. See *Mbazomo v. ETourandtravel, Inc.*, 16-CV-2229-SB, 2016 U.S. Dist. LEXIS 170186, 2016 WL 7165693, at *2 (E.D. Cal. Dec. 8, 2016).  In *Mbazamo*, the court held that a violation of the TCPA represents a concrete injury because "[t]he history of sustaining claims against both unwelcome intrusion into a plaintiff's

seclusion and unceasing debt-collector harassment are squarely 'harm[s] that [have] traditionally been regarded as providing a basis for a lawsuit.'" Mbazomo, 2016 U.S. Dist. LEXIS 170186, 2016 WL 7165693, at *2 (quoting *Spokeo*, 136 S.Ct. at 1549-50). The court declined to follow Romero, explaining that Romero "improperly erodes the pleading standard set under Fed. R. Civ. P. 8(a) . . . . A plaintiff [need only] plausibly tie the alleged acts of the defendant to the alleged harms suffered." Id.  *Messerlian v. Rentokil N. Am., Inc.* (C.D.Cal. Dec. 15, 2016, No. CV 16-6941-GW (GJSx)) 2016 U.S.Dist.LEXIS 175224, at *7-8.

45.      "To establish injury in fact, a plaintiff must show that he or she suffered 'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'" *Spokeo*. at 1548 (quoting *Lujan*, 504 U.S. at 560).  The Supreme Court noted that concreteness is quite distinct from particularization. *Id.* An injury is "particularized" if it affects "the plaintiff in a personal and individual way." *Id.* In addition, for an injury to be "concrete", it must be "de facto," meaning that it is "real" and not "abstract." *Id.* However, an injury need not be "tangible" in order to be "concrete," and intangible injuries may constitute injury in fact. *Id.* at 1549. In order to determine whether an intangible harm constitutes injury in fact, *Spokeo* provided two factors to be considered: "history and the judgment of Congress." *Id.* at 1549. Specifically, "(1) whether the statutory violation bears a 'close relationship to a harm that has

traditionally been regarded as providing a basis for a lawsuit in English or American courts,' and (2) congressional judgment in establishing the statutory right, including whether the statutory right is substantive or procedural." *Matera v. Google*, No. 15cv 4062-LHK, 2016 WL 5339806, at *9 (N.D. Cal. Sept. 23, 2016). *Spokeo* also held that "the violation of a procedural right granted by statute can be sufficient in some circumstances to constitute injury in fact." *Spokeo*, 136 S. Ct. at 1549.  In such a case, a plaintiff "need not allege any additional harm beyond the one [the legislature] has identified." *Id.*

46.     The TCPA provides a private right of action for violations of § 227(b) and the associated regulations. 47 U.S.C. § 227(b)(3).  Subsection (b) prohibits calls (other than for an emergency) to a telephone number assigned to a cellphone by way of an automatic telephone dialing system ("ATDS") without the prior express consent of the called party. 47 U.S.C. § 227(b)(1)(A)(iii).  In the Ninth Circuit, a plaintiff must show: (1) "the defendant called a cellular telephone number; (2) "using an automatic telephone dialing system; (3) without the recipient's prior express consent." *Meyer v. Portfolio Recovery Assocs., LLC*, 707 F.3d 1036, 1043 (9th Cir. 2012).  A plaintiff must also be a "called party" within the definition of the TCPA. *Charkchyan v. EZ Capital*, No. 2:14-cv-03564-ODW (ASx), 2015 U.S. Dist. LEXIS 76560, 2015 WL 3660315, at *3 (C.D. Cal. June 11, 2015)

47.     First, a text message and a prerecorded robotic voice message call are both a "call" for purposes of the TCPA. *Satterfield v. Simon & Schuster, Inc.*, 569 F.3d 946, 952-54 (9th Cir. 2009).  Plaintiff supports these allegations with activity logs from July 2017 to December 2018 documenting the calls (see above). This element is satisfied.

48.     Second, Plaintiff adequately pleads use of an automatic telephone dialing system ("ATDS").  The TCPA defines ATDS to mean "equipment which has the capacity — (A) to store or produce telephone numbers to be called, using a random or sequential number generator; and (B) to dial such numbers." 47 U.S.C. § 227(a)(1). The focus of the inquiry is on the equipment's *capacity* to perform this function. *See Satterfield*, 569 F.3d at 951.  "Accordingly, a system need not actually store, produce, or call randomly or sequentially generated telephone numbers, it need only have the capacity to do it." *Id.* Defendants called with a prerecorded message, which, by definition requires an auto-dialer that operates without human intervention.

49.     "In proving a defendant's use of [an] ATDS under the TCPA, courts have recognized the difficulty a plaintiff faces in knowing the type of calling system the defendant used without the benefit of discovery." *Charkchyan*, 2015 U.S. Dist. LEXIS 76560, 2015 WL 3660315 at *3.  For example, in *Charkchyan*, the plaintiff's allegations supported the use of an ATDS. *Id.*  In that case, the plaintiff

described the messages received "as being formatted in SMS short code, '670-76,'" and as being impersonally scripted. *Id.* This was enough to establish the defendant used an ATDS. *Id.* Similarly, in *Kramer v. Autobytel*, the plaintiff alleged sufficient facts to support a reasonable inference that the defendants used an ATDS: "[The plaintiff] described the messages from SMS short code 77893, a code registered to [a defendant]. The messages were advertisements written in an impersonal manner. [And,] [the plaintiff] had no other reason to be in contact with the Defendants." 759 F. Supp. 2d 1165, 1171 (N.D. Cal. 2010). In contrast, the plaintiff in *Williams v. T-Mobile USA, Inc.* failed to plead more than "legal conclusions couched in fact" when asserting the "barrage of calls and . . . frequency and pattern of the calls provide[d] the necessary factual support." No. 15-cv-3384-JSW, 2015 U.S. Dist. LEXIS 140077, 2015 WL 5962270, at *2-3 (N.D. Cal. Oct. 14, 2015). *See also Daniels v. ComUnity Lending, Inc.*, No. 13cv488-WQH-JMA, 2014 U.S. Dist. LEXIS 1606, 2014 WL 51275, at *5 (S.D. Cal. Jan. 6, 2014) (ATDS use not plausible because the allegations indicated the defendants directed calls specifically towards the plaintiff).

50.     Here, Plaintiff alleges that Defendant Erlich, Bagley and Arcallana contacted him using a "telephone dialing system." This is insufficient standing alone, but as in *Charkchyan* and *Kramer*, Plaintiff alleges sufficient additional facts. First, each of the calls are available to the Court as audio recordings of the robotic voice

18CV

message that initiated the calls. Second, the calls are impersonal advertisements: they do not address Plaintiff personally and they advertise Defendant's product. Third, Plaintiff declares that he has never heard of Defendants, visited any location operated by Defendants prior to the harassing and annoying calls, nor provided his cellular telephone numbers to Defendants or consented to receive calls from Defendants.  Plaintiff also has had no prior business relationship with Defendants. Plaintiffs had no reason to be in contact with Defendants nor have they ever purchased any kind of product or service. Plaintiff's allegations are sufficient to establish that Defendants used ATDS in sending their prerecorded solicitation messages.

51.     Third, Plaintiff adequately pleads that the conduct was without his prior express consent. "Prior express consent" under the TCPA is "consent that is clearly and unmistakably stated." *Satterfield*, 569 F.3d at 955; *Charkchyan*, 2015 U.S. Dist. LEXIS 76560, 2015 WL 3660315 at *3.  Moreover, "[t]he Federal Communications Commission ('FCC'), tasked with instituting implementing regulations for the TCPA, added an express *written* consent requirement in the case of messages that 'include[] or introduce[] an advertisement or constitute[] telemarketing.'"  *Meyer v. Bebe Stores, Inc.*, No. 14-cv-00267-YGR, 2015 U.S. Dist. LEXIS 12060, 2015 WL 431148, at *3 (N.D. Cal. Feb. 2, 2015) (citing 47 C.F.R. § 64.1200(a)(2)).  An "advertisement" includes "any material advertising

18CV

the commercial availability or quality of any property, goods, or services." 47 C.F.R. § 64.1200(f)(1). "Telemarketing" means the initiation of a telephone call or message for the purpose of encouraging the purchase or rental of, or investment in, property, goods, or services, which is transmitted to any person." *Id.* § 64.1200(f)(12). Establishing prior express consent of the called party "is an affirmative defense for which the defendant bears the burden of proof."

*Charkchyan*, 2015 U.S. Dist. LEXIS 76560, 2015 WL 3660315 at *3.

52.     In *Charkchyan*, the plaintiff did not give prior express consent. *Id.* There, the plaintiff claimed: "(1) he [was] the current subscriber to the cellular telephone at issue; (2) he [had] never heard of [the defendant]; (3) he [had] never visited any location operated by [the defendant]; and (4) he [had] never provided his cellular number to [the defendant], nor consented to receiving calls from [the defendant]." *Id.* Where the defendant failed to provide any conflicting evidence, this was sufficient. *Id.*

53.     Similarly, in Plaintiff's case, the allegations establish that he did not give prior express consent. He declared that he was "the regular user and subscriber to the cellular telephone number at issue." He also declared that he has "never heard of [Defendants], visited any location operated by [Defendants], provided [his] cellular telephone number to [Defendants,] or consented to receive text messages from [Defendants]." As in *Charkchyan*, these allegations are sufficient to support

Plaintiff's claims that he did not give prior express consent authorizing Defendants to send the prerecorded messages. Furthermore, the calls promote the sender's illegal Medicare insurance relief business and fall within the FCC's definition of an advertisement and/or telemarketing.  Thus, express written consent was required, and there is no evidence of such. This element is consequently satisfied.

54.    Fourth, Plaintiff sufficiently pleads that he was the "called party." To have standing under the TCPA, a plaintiff must be the "called party." *See Charkchyan*, 2015 U.S. Dist. LEXIS 76560, 2015 WL 3660315 at *3, *4; 47 U.S.C. § 227(b)(1)(A). A telephone service subscriber is the "called party" within the meaning of the TCPA. *Charkchyan*, 2015 U.S. Dist. LEXIS 76560, 2015 WL 3660315 at *3; *Gutierrez v. Barclays Group*, No. 10cv1012 DMS (BGS), 2011 U.S. Dist. LEXIS 12546, 2011 WL 579238, at *4 (S.D. Cal. Feb. 9, 2011). Here, Plaintiff declares that he was "the regular user and subscriber to the cellular phone number" that received the calls and messages.  Plaintiff is therefore the "called party." *See Charkchyan*, 2015 U.S. Dist. LEXIS 76560, 2015 WL 3660315 at *3. *Drew v. Defendants Consumer Advocacy, LLC*, No. 16-cv-00200-LB, 2016 U.S. Dist. LEXIS 52385, at *11-16 (N.D. Cal. Apr. 18, 2016).

## VI. FACTUAL ALLEGATIONS

**A. National Insurance USA Group, LLC**

55.    One of NATIONAL INSURANCE's strategies for marketing its services is placing telemarketing robocalls to those who have not consented to receive such solicitations, including Plaintiff.

56.    NATIONAL INSURANCE uses equipment that has the capacity to store or produce random or sequential telephone numbers to be called and that includes autodialers and predictive dialers (each an "automatic telephone dialing system" or "ATDS").

57.    A third party sold leads to NATIONAL INSURANCE and Arcallana, and Bagley is the marketing agent for Erlich.  Arcallana knowingly advertises through NATIONAL INSURANCE.  Each Defendant knows of and in aware of each of the other Defendant's duties, responsibilities and function within the telemarketing operation.  Each Defendant is a co-conspirator with each other Defendant in this matter.  They all know each other, they all talk to eachother.  They have all designed, planned and orchestrated the telemarketing scheme and scam together.

**B. Plaintiff**

58.    Plaintiff Anton Ewing is, and at all times mentioned herein was, a "person" as defined by 47 U.S.C. § 153(39).

**C. Telephone numbers 619-719-9640 and 619-987-2016**

59.    A phone number beginning 619-719-9640 is registered to Mr. Ewing.

60.    619-719-9640 and 619-798-2016 are on the National Do Not Call Registry.

18CV

61.     Mr. Ewing answers calls made to 619-719-9640.

62.     Mr. Ewing pays the phone bills for 619-719-9640.

**F. NATIONAL INSURANCE's Illegal Telemarketing Robocalls to Plaintiff**

63.     On December 26, 2018, a call to 619-719-9640, which is Mr. Ewing's cellular telephone, caused his cell phone to ring. Mr. Ewing picked up. The person on the other end wasn't anyone Mr. Ewing knew. In fact, it wasn't a person at all; it was a prerecorded voice. The voice advertised Medicare relief from NATIONAL INSURANCE.

64.     Plaintiff has never heard of Arcallana, NATIONAL INSURANCE, Erlich or Bagley and had not given them permission to call him, let alone with a telemarketing robocall. Mr. Ewing was surprised and frustrated to be interrupted by a prerecorded solicitation to a phone number that had long been on the National Do No Call Registry. Previously, in December of 2018, a call to 619-719-9640 caused Mr. Ewing's cell phone to ring again. Again it was a prerecorded voice, again advertising Medicare relief and restructuring, again from NATIONAL INSURANCE's telemarketing call center.

65.     It didn't stop there. *NATIONAL INSURANCE placed at least 5 telemarketing robocalls to Mr. Ewing.* Calls on December 26, 2018 came from blocked lines. The agent on the phone said he was with the NATIONAL INSURANCE and that he had licensed insurance agents on staff. The agents said their names were Justin

18CV

and Kim on the call.   Defendants have also called dozens of times to try to sell Plaintiff a backbrace and/or a knee brace.

66.     Most of these robocalls used a prerecorded or artificial voice, while the rest were marked by an unnatural click or pause at the beginning—signaling to Mr. Ewing that the call was placed by an ATDS rather than manually dialed by a person.

67.     More than a dozen of NATIONAL INSURANCE's telemarketing robocalls were made to Mr. Ewing while he was in California, in this District.

68.     More than a dozen of NATIONAL INSURANCE's telemarketing robocalls were made to Mr. Ewing after NATIONAL INSURANCE knew of his desire to never been solicited via telemarketing calls, which is publicly known in this District.

69.     Mr. Ewing repeatedly asked NATIONAL INSURANCE to stop calling.

70.     Due to the massive volume of robocalls made by Defendant NATIONAL INSURANCE to him, Plaintiffs' investigation into the calls and their illegal features (e.g., prerecorded voices and placement by an ATDS, as manifested by beginning with an unnatural click or pause) is ongoing.

18CV

## VII. FIRST CLAIM FOR RELIEF

### (Non-Emergency Robocalls to Cellular Telephones, 47 U.S.C. § 227(b)(1)(A))

71.     Plaintiffs reallege and incorporate by reference each and every allegation set forth in the preceding paragraphs.

72.     The foregoing acts and omissions of NATIONAL INSURANCE and/or its affiliates or agents constitute multiple violations of the TCPA, 47 U.S.C. § 227(b)(1)(A), by making non-emergency telemarketing robocalls to the cellular telephone numbers of Plaintiffs without prior express written consent.

73.     Arcallana, Bagley and Erlich are affiliates and agents of NATIONAL INSURANCE.

74.     Each named defendant in this matter is vicariously liable for the acts and actions of each of the other named defendants under the *Gomez* case from the US Supreme Court handed down on January 20, 2016.

75.     Plaintiff is entitled to an award of at least $500 in damages for each such violation. 47 U.S.C. § 227(b)(3)(B).

76.     Plaintiff is entitled to an award of up to $1,500 in damages for each such knowing or willful violation. 47 U.S.C. § 227(b)(3).

77.     Plaintiff also seek a permanent injunction prohibiting NATIONAL INSURANCE, NATIONAL INSURANCE and its affiliates and agents from

18CV

making non-emergency telemarketing robocalls to cellular telephone numbers without prior express written consent of the called party.

## VIII. SECOND CLAIM FOR RELIEF

**(Non-Emergency Robocalls to Residential Telephones, 47 U.S.C. § 227(b)(1)(B))**

78.    Mr. Ewing realleges and incorporates by reference each and every allegation set forth in the preceding paragraphs.

79.    The foregoing acts and omissions of NATIONAL INSURANCE and/or its affiliates or agents constitute multiple violations of the TCPA, 47 U.S.C. § 227(b)(1)(B), by making non-emergency prerecorded telemarketing calls to the residential telephone 619-987-2016 number of Mr. Ewing without prior express written consent.

80.    Mr. Ewing is entitled to an award of at least $500 in damages for each such violation. 47 U.S.C. § 227(b)(3)(B).

81.    Mr. Ewing is entitled to an award of up to $1,500 in damages for each such knowing or willful violation. 47 U.S.C. § 227(b)(3).

82.    Mr. Ewing also seeks a permanent injunction prohibiting NATIONAL INSURANCE, NATIONAL INSURANCE and its affiliates and agents from making non-emergency prerecorded telemarketing calls to residential telephone numbers without prior express written consent of the called party.

18CV

## IX. THIRD CLAIM FOR RELIEF

**(Telemarketing Solicitations to National Do Not Call Registrants, 47 U.S.C. § 227(c))**

83.     Plaintiffs reallege and incorporate by reference each and every allegation set forth in the preceding paragraphs.

84.     The foregoing acts and omissions of NATIONAL INSURANCE and/or its affiliates or agents constitute multiple violations of the TCPA, 47 U.S.C. § 227(c), by making telemarketing solicitations to residential and wireless telephone numbers listed on the Federal Government's National Do Not Call Registry. 47 C.F.R. §64.1200(c)(2).

85.     Plaintiff is entitled to an award of at least $500 in damages for each such violation. 47 U.S.C. § 227(c)(5)(B).

86.     Plaintiff is entitled to an award of up to $1,500 in damages for each such knowing or willful violation. 47 U.S.C. § 227(c)(5).

87.     Plaintiff also seeks a permanent injunction prohibiting NATIONAL INSURANCE, NATIONAL INSURANCE and its affiliates and agents from making telemarketing solicitations to residential and wireless telephone numbers listed on the Federal Government's National Do Not Call Registry.

## XI. PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment against all Defendants, jointly and severally, as follows:

18CV

A. Leave to amend this Complaint to conform to the evidence presented at trial;

B. A declaration that actions complained of herein by NATIONAL INSURANCE, Bagley Erlich, and Arcallana violate the TCPA, CIPA and the UCL;

C. An order enjoining Bagley, Erlich, Arcallana and NATIONAL INSURANCE and its affiliates and agents from engaging in the unlawful conduct set forth herein, including violation of 47 USC §501;

D. An award to Plaintiff of damages, as allowed by law under the TCPA, and not limited to the calls listed in the preliminary table above;

E. For statutory damages in the amount of $5,000 per violation pursuant to California Penal Code §637.2(a)(1) or, if greater, three times actual damages as provided in California Penal Code §637.2(a)(2);

F. $500 plus threefold damages for intentional or willful violation of the Do-Not-Call Registry for each and every call;

G. For punitive damages in an amount to be determined with exactness at trial herein;

H. For a preliminary and permanent injunction to restrain further violations of the CIPA, pursuant to California Penal Code §637.2(b);

18CV

I. For the payment of reasonable attorneys' fees and costs of suit incurred

herein under all applicable statutes and rules including under Cal. Civ.

Proc. Code §1021.5 for attorneys that have been or will be hired;

J. For an injunction prohibiting all Defendants from ever contacting Plaintiff

ever again in any manner whatsoever, including spam texting,

robodialing, and spam emailing;

K. $1,500 for each violation of 16 CFR §610.4(b)(iii)(B) initiating a call to a

DNC registered number;

L. $1,500 for each violation of 47 CFR §64.1601(3)  caller ID spoofing;

M. $1,500 for each violation of 47 CFR §64.1200(d)(1) failure to provide copy

of written do not call policy;

N. $1,500 for each violation of 47 CFR §64.1200(b)(1) failure to state name of

business at beginning of call;

O. $1,500 for each violation of 47 USC §227(b)(1)(A)(iii) willful or knowing

call to cellular phone;

P. $1,500 for each violation of 47 USC §227(b)(1) for using an ATDS;

Q. $1,500 for each violation of 47 USC §227(c) and (d) for calling a phone

number on the DNC registry; and

R. For any other relief that the Court deems just and proper.

# XI. DEMAND FOR JURY

Plaintiff demands a trial by jury for all issues so triable.

Dated:  December 27, 2018

/S/ Anton Ewing
Anton Ewing, Plaintiff

# EXHIBIT A

ORIGINAL

# United States District Court

## NORTHERN DISTRICT OF GEORGIA

FILED IN CHAMBERS
U.S.D.C. - Atlanta

SEP 2 5 2018

James N. Hatten, Clerk

By: _____ Deputy Clerk

UNITED STATES OF AMERICA

v.

MATTHEW ALAN BAGLEY,
AKA Matthew Alan Bagley Palacios

**CRIMINAL COMPLAINT**

Case Number: 1:18-MJ-954

I, the undersigned complainant being duly sworn, state the following is true and correct to the best of my knowledge and belief. Beginning on a date unknown, but at least in or about 2016, and continuing through May 2018, in the Northern District of Georgia, defendant did: (1) knowingly and willfully execute, attempt to execute, and conspire with others to execute a scheme or artifice to defraud any healthcare benefit program and obtain by means of false and fraudulent pretenses, representations or promises, any money or property owned by or under the custody or control of any healthcare benefit program; (2) conspired with others to conduct and attempt to conduct financial transactions affecting interstate commerce with the proceeds of a specified unlawful activity, that is a healthcare fraud scheme, knowing that the financial transactions were designed to conceal and disguise the nature, location, source and control of the proceeds of the healthcare fraud scheme, in violation of Title 18, United States Code, Section 1956(a)(1)(B)(i); (3) aided and abetted others, did knowingly transfer, possess, and use, without lawful authority, a means of identification of another persons, to wit, the names and dates of birth of M.N. and T.B. in relation to commission of healthcare fraud, a felony offense enumerated in Title 18, United States Code, Section 1028A(c),

in violation of Title 18, United States Code, Section(s) 2, 1028A, 1347, 1349, 1956(h).

I further state that I am a(n) Special Agent and that this complaint is based on the following facts:

PLEASE SEE ATTACHED AFFIDAVIT

Continued on the attached sheet and made a part hereof.   Yes

Signature of Complainant
Gregory Peacock

Based upon this complaint, this Court finds that there is probable cause to believe that an offense has been committed and that the defendant has committed it.  Sworn to before me, and subscribed in my presence

September 25, 2018
Date

at   Atlanta, Georgia
City and State

LINDA T. WALKER
UNITED STATES MAGISTRATE JUDGE
Name and Title of Judicial Officer
AUSA Jeffrey Brown / 2017R00848

Signature of Judicial Officer

## AFFIDAVIT

I, Gregory P. Peacock, a Special Agent with the Federal Bureau of Investigation ("FBI"), United States Department of Justice, being first duly sworn, hereby depose and state that:

1.      I am a Special Agent with the Federal Bureau of Investigation ("FBI") and have been so employed for approximately fourteen years and ten months.  I am presently assigned to the FBI's Atlanta Field Office, which is in the Northern District of Georgia, where I serve as a member of the Health Care Fraud Unit.  My official duties include the investigation of suspected criminal fraud committed by individuals and organizations against Medicare, Medicaid and private health care insurance companies, including violations of Title 18, United States Code, Sections 1341, 1343 and 1347.

2.      This affidavit is submitted in support of a Criminal Complaint charging, MATTHEW ALAN BAGLEY, aka MATTHEW ALAN BAGLEY PALACIOS, with Healthcare Fraud and Conspiracy to Commit Healthcare fraud in violation of Title 18, United States Code, Sections 1347 and 1349, Conspiracy to Commit Money Laundering in violation of Title 18, United States Code, Section 1956(h) and Aggravated Identity Theft in violation of Title 18, United States Code, Section 1028A(a)(1).

3.      This affidavit is based on my knowledge of the investigation and on information furnished to me from numerous other sources to include statements, Grand Jury subpoenas, search warrant data, Requests For Information (RFIs) and other law enforcement officers, including but not limited to FBI Special Agents and Special Agents with the United States Department of Health and Human Services, Office of the Inspector General ("HHS-OIG").

4.      As this affidavit is being submitted for the limited purpose of securing a Criminal

1

Complaint; I have not included each and every fact known to me concerning this investigation.   I
have set forth the facts that I believe are necessary to establish that probable cause exists to support
a Criminal Complaint.

　　　5.   In late 2017, I received reports and/or information from the Special Investigation Units
(SIUs) of several medical insurance companies, including Humana, United Healthcare, and Cigna.
In the reports, the SIUs detail a fraudulent Durable Medical Equipment (DME) scheme being
perpetrated by Matthew Alan Palacios Bagley.   The scheme involves companies that are owned
or controlled by Matthew Bagley billing insurance companies for DME including, back, neck,
knee and other braces that were not medically necessary or never provided to insureds. Insureds
reported receiving soliciting phone calls about receiving free braces and then receiving braces that
that they did not need, did not want and/or did not request. In addition, further investigation
revealed that many of the insureds did not receive the type of braces that the insurance company
was billed.

### Matthew Alan Palacios Bagley

　　　6.   MATTHEW ALAN BAGLEY, aka MATTHEW ALAN BAGLEY PALACIOS
("Bagley") was born in Boston, Massachusetts on March 28, 1980.   UnitedHealthcare reports that
a Matthew Bagley once worked for approximately three weeks in a call center for UnitedHealth
Group (associated with UnitedHealthcare) but did not have access to information that would have
led to this scheme.   In 2007, Bagley renounced his American citizenship and now holds
Panamanian citizenship.   Records show that Bagley has traveled between the countries of Taiwan,
Panama, The Philippines, Mexico, and is now believed to reside in Canada.   This investigation
has revealed additional fraud schemes perpetrated by Bagley related to pharmacies and one

2

specific company called the WakaNetwork. Those schemes, however, are not the focus of this investigation. The majority of the schemes Bagley is associated with involve operating telephone call centers outside the United States and defrauding healthcare companies in the United States. UnitedHealthcare research indicates Bagley is connected with over eighty companies internationally, primarily in Panama.

### Review of Bank Accounts at Bank of America

7. Bagley utilized approximately sixty-five accounts with Bank of America for his fraudulent activity. A review of banking records received via subpoena for these accounts show a pattern. There were twenty-three accounts which still held funds at the time investigative activity by insurance companies interfered with his banking relationship. Signature cards provided by Bank of America list Matthew Bagley as President and/or CEO of twenty-two of these twenty-three accounts, as well as, the only authorized signer. The bank was unable to locate the signature card for one account, Charleston Medical Supplies, account number xxxx1223. Counter deposits of checks were made in a majority of the accounts. All of the deposited checks are from private insurance companies. The funds then are moved around throughout the accounts but typically are funneled into one of five accounts for a specific use. Based on review, account xxxx1495 listed as Medical USA and Medical International Group is used to move money to financial institutions located outside the United States and to pay co-conspirators believed to be located outside the United States. Account xxxx6787 listed as TBS Group is used to pay bills for items related to the business such as FedEx and UPS balances or online services. Account xxxx5374 listed as Atlanta Medical Supplies is used to transfer money to banks located outside the United States and to pay co-conspirators located outside the United States. Account xxxx1747

3

listed as Medical Equipment USA Inc, with an Atlanta, GA address, is used to pay Comfortland, the drop shipper for orthopedic braces.  Account xxxx1754 listed as Medical Equipment USA Inc., with an Atlanta, GA address, is used to pay bills for items related to the business such as FedEx and UPS balances or online services.

8.    When these accounts were initially discovered at Bank of America, an unidentified female was shown on camera as the person making all of the counter deposits of paper checks from insurance companies at a branch in Florida.  Through investigation, Maryellen Upton also known as Maryellen Jornet was identified, located, and interviewed.  Upton is the manager of a virtual office located in Boca Raton, FL and admitted she was the person who made the counter deposits of checks from UnitedHealthcare, Humana, Aetna, and other insurance companies into Bank of America accounts on a list provided by Bagley.  Utilizing the virtual offices used as physical addresses for each company, these checks were forwarded to the office where Upton works via United States Postal service or a private/commercial carrier.  At Bagley's request and for periodic payments to Upton, she agreed to take the checks and deposit them in the respective accounts at Bank of America.  Upton provided a copy of a spreadsheet that Bagley supplied to her via email listing the companies with bank account numbers he wanted her to deposit checks.  Twenty of the twenty-three companies previously referenced in paragraph seven of this affidavit were listed in this spreadsheet.  The three accounts not listed in the spreadsheet were TBS Group, Medical Equipment USA Inc. (xxxx1747), and Medical Equipment USA Inc. (xxxx1754).  A review of bank records for these three companies show they receive the majority of their funding from bank transfers from the various companies listed on the spreadsheet Bagley supplied to Upton.

4

9. On June 19, 2018, a Seizure Warrant was signed in the Northern District of Georgia by Magistrate Judge Linda T. Walker authorizing the seizure of the remaining funds in the twenty three accounts at Bank of America. On or about July 5, 2018, this affiant received a cashier's check from Bank of America for $381,774.48 complying with the seizure warrant.

### Associated DME Companies

10. In December 2017, UnitedHealthcare's SIU had identified sixty-eight entities operated by Bagley. A listing of these companies, along with their taxpayer identification numbers, associated billing and amounts paid follows. UnitedHealthcare asserts these funds represent proceeds from the commission of health care fraud.

| | TIN | Name of Provider | TOTAL BILLED | TOTAL PAID |
|---|---|---|---|---|
| 1 | 462101976 | Lemon Grove Medical Supplies | $1,637,986.39 | $841,879.01 |
| 2 | 571216466 | Edina Medical Supplies | | |
| 3 | 742782573 | Medical USA & Medical International | | |
| 4 | 813801902 | TBS Group dba The Brace Specialists | $1,307,694.00 | $236,952.33 |
| 5 | 814502458 | Medical Equipment USA | $4,364,510.47 | $1,676,468.30 |
| 6 | 820722742 | Providence Medical Supplies | $135,408.01 | $88,903.49 |
| 7 | 820723590 | Kansas Medical Supplies, LLC | $852,732.42 | $174,418.93 |
| 8 | 820724228 | Washington Medical Supplies LLC | $124,643.21 | $31,868.37 |
| 9 | 820725108 | Atlanta Medical Supplies, LLC | $4,339,497.32 | $889,026.04 |
| 10 | 820725702 | Rapid City Medical Supplies, LLC | | |
| 11 | 820726025 | Des Moines Medical Supplies | $69,622.00 | $37,779.18 |
| 12 | 820726486 | Waterville Medical Supplies | $257,186.83 | $147,066.43 |
| 13 | 820726757 | Lincoln Medical Supplies | $407,661.18 | $237,803.14 |
| 14 | 820726984 | Madison Medical Supplies | $496,729.06 | $150,038.00 |
| 15 | 820727217 | Charleston Medical Supplies, LLC | $444,599.45 | $146,090.73 |
| 16 | 820727421 | Honolulu Medical Supplies, LLC/Lansing Medical Supplies, LLC | $485,156.69 | $149,094.63 |
| 17 | 820728074 | Honolulu Medical Supplies | $84,273.86 | $24,043.54 |
| 18 | 820728504 | Tualatin Medical Supplies, LLC | $265,523.96 | $131,448.69 |
| 19 | 820729037 | Oklahoma Medical Supplies | $1,143,677.27 | $416,657.25 |
| 20 | 820843263 | Seatle Medical Supplies, LLC | $192,346.91 | $106,677.29 |
| 21 | 820843457 | Boston Medical Supplies, LLC | $25,872.97 | $9,384.64 |

| | TIN | Name of Provider | TOTAL BILLED | TOTAL PAID |
|---|---|---|---|---|
| 22 | 820843603 | Manhattan Medical Supplies, LLC | $338,223.62 | $74,907.35 |
| 23 | 820843773 | Hamilton Medical Supplies, LLC | $293,404.63 | $129,203.37 |
| 24 | 820844056 | Saint Paul Medical Supplies, LLC | $12,040.21 | $4,589.56 |
| 25 | 820844554 | Cheyenne Medical Supplies, LLC | | |
| 26 | 820844849 | Shelburne Medical Supplies, LLC | $6,304.98 | $2,138.45 |
| 27 | 821997623 | Fulton Health Supplies, LLC | | |
| 28 | 821997743 | Hennepin Health Supplies, LLC | $11,193.21 | $7,004.11 |
| 29 | 821997858 | Gallatin Health Supplies LLC | $50,329.50 | $26,784.24 |
| 30 | 821997884 | Douglas Health Supplies, LLC | $26,168.94 | $17,621.96 |
| 31 | 821997925 | Polk Health Supplies, LLC | $26,168.94 | $19,288.83 |
| 32 | 821997967 | Dane Health Supplies, LLC | $122,877.13 | $62,626.53 |
| 33 | 821998016 | Bernalillo Health Supplies, LLC | $35,175.60 | $20,053.79 |
| 34 | 821998055 | Minnehaha Health Supplies, LLC | $132,859.28 | $72,598.94 |
| 35 | 821998085 | Tulsa Health Supplies, LLC | $64,140.50 | $20,883.12 |
| 36 | 821998158 | Morris Health Supplies, LLC | $83,202.25 | $48,687.52 |
| 37 | 821998178 | New Castle Health Supplies, LLC | $83,179.13 | $58,831.69 |
| 38 | 821998206 | New York Health Supplies, LLC | $105,691.95 | $69,244.78 |
| 39 | 821998240 | Logan Circle Health Supplies | $37,243.83 | $23,307.61 |
| 40 | 821998268 | Hillsborough Health Supplies, LLC | $4,388.60 | $3,440.68 |
| 41 | 822066963 | Newport Health Supplies, LLC | $353,297.08 | $168,086.02 |
| 42 | 822067219 | King Health Supplies, LLC | | |
| 43 | 822136250 | Boone Health Supplies, LLC | $6,540.80 | $3,790.83 |
| 44 | 822148434 | Laramie Health Supplies, LLC | $5,032.95 | $3,156.68 |
| 45 | 822419383 | Washington Health Supplies, LLC | $23,490.29 | $14,085.77 |
| 46 | 822419536 | Chief Logan Health Supplies LLC | $1,006.59 | $0.00 |
| 47 | 822419565 | Iowa Health Supplies, LLC | | |
| 48 | 822419597 | Jackson Health Supplies, LLC | $43,239.09 | $20,780.65 |
| 49 | 822464835 | Edina Medical Supplies | $539,190.38 | $313,851.59 |
| 50 | 822465077 | Minneapolis Health Supplies, LLC | $356,814.25 | $169,005.40 |
| 51 | 822465190 | Manchester Health Supplies, LLC | $196,530.13 | $107,712.68 |
| 52 | 822465303 | Murray Health Supplies, LLC | $106,858.71 | $55,233.48 |
| 53 | 822465396 | Middleton Health Supplies, LLC | $54,953.53 | $33,240.56 |
| 54 | 822465532 | Monroe Health Supplies, LLC / Monroe Medical Supplies | $206,175.07 | $100,505.08 |
| 55 | 822465641 | GIG Harbor Medical Supplies LLC | $239,528.09 | $147,611.23 |
| 56 | 822477051 | Lansing Health Supplies | $118,074.39 | $62,743.92 |
| 57 | 822477188 | Fort Lee Health Supplies, LLC | $441,433.27 | $207,040.85 |
| 58 | 822477240 | Great Falls Health Supplies, LLC | $174,905.87 | $102,726.10 |
| 59 | 822485882 | Sussex Medical Supplies, LLC | $57,254.32 | $35,084.03 |

| | TIN | Name of Provider | TOTAL BILLED | TOTAL PAID |
|---|---|---|---|---|
| 60 | 822485955 | Decatur Medical Supplies, LLC | $243,205.96 | $148,188.88 |
| 61 | 822486132 | Kaumualii Medical Supplies, LLC | $8,694.70 | $6,275.22 |
| 62 | 822492016 | Albuquerque Health Supplies, LLC | $370,486.04 | $198,958.83 |
| 63 | 822492068 | Clackamas Medical Supplies, LLC | $147,493.95 | $88,721.28 |
| 64 | 822566097 | Douglas Medical Supplies, LLC | $439,306.71 | $265,860.17 |
| 65 | 000000000 | Hawaii Health Supplies, LLC | | |
| 66 | 000000000 | Rockland Medical Supplies, LLC | | |
| 67 | 000000000 | Williston Health Supplies, LLC | | |
| 68 | 000000000 | West Midlands Health Supplies, LLC | | |
| | **Total** | | $22,201,126.47 | $8,409,471.77 |

11. UnitedHealthcare SIU pulled secretary of state (SOS) information for every entity that they could locate. Fifty-two filings were located. All except one had Incorp Services, Inc. as the registered agent. Incorp is an online registered agent service. Often the entities were filed with their respective state on the same date as other entities. Other individuals were named in the filings, Nadine Long, Erin Regan, Danielle Littlejohn, and Jaycie Howard, but they appear to work for Incorp Services, Inc. in Las Vegas, Nevada. The only name mentioned, if there was a manager or president listed, was Matthew Bagley or Matthew Palacios and the company Medical USA & Medical International Group, LLC. The companies appear to be filed with the Secretary of States' in waves.

### Atlanta Medical Supply, LLC

12. One of these fifty-seven DME providers is a company called Atlanta Medical Supplies, LLC (AMS). A search on the Georgia Secretary of State website lists AMS's principal office address as 260 Peachtree Street NW Ste 2200, Atlanta, Georgia 30303. A signature card provided by Bank of America for account number xxxx5374 lists the account holder as Atlanta Medical Supplies, LLC with a statement address as 260 Peachtree Street NW Ste 2200, Atlanta,

7

Georgia 30303. The designated account signer listed for this account is Matthew Bagley with a title of President.

13. On January 26, 2018, this affiant took part in an interview of Veronica Hargrove, manager at Regus Virtual Office, located at 260 Peachtree Street NW Ste 2200, Atlanta, Georgia 30303. Hargrove confirmed AMS was a current client receiving mail at their location. Hargrove had never met anyone from AMS with the only contact being from a woman who would call periodically asking for tracking numbers for the mail being forwarded. Hargrove explained that Regus just collects the mail for AMS and forwards it to an address in Wilmington, DE.

14. In interviews of the insured, braces they received were shipped in boxes marked Comfortland. Investigation determined that this company is located in Mebane, NC and is the drop shipper of orthopedic braces for Bagley's companies. A subpoena to Comfortland resulted in a list of patients for Bagley's companies. Included in this information was a list of patients for AMS. One of the patients in this list was Randy Tucker who resides in Atlanta, Georgia. The information states that Tucker was shipped a type of knee brace with model number L1851 with a claim date of April 7, 2017.

15. On January 26, 2018, Tucker was interviewed and he recalled being cold called approximately two years ago by someone trying to sell him various braces. They told him he would not have to pay anything and that his Medicaid would cover all of the costs. Tucker admitted he constantly is being called by people wanting to ship him different braces. He has received numerous braces over the past two years. Tucker showed the interviewing agents all the braces he currently had but none was the model L1851 brace. Tucker was shown a photograph from Comfortland's website of the L1851 brace and he said he did not remember

8

ever receiving a brace that looked like that. Tucker showed agents a copy of his

UnitedHealthcare insurance card that showed the identity of his Primary Care Physician.

Tucker also sees a doctor at Emory University about his Type 2 diabetes. According to Tucker,

he has never spoken to either of these doctors about any braces.  In fact, he has never spoken to

any medical doctor about any braces the telephone cold callers wanted to prescribe for him.

16.  Two other "patients" of AMS were located and interviewed.  Neither had ever seen

a doctor about any prescription braces.  The first, Minnie Newton, is not medically able to wear

the brace she is listed to have received.  Newton never remembered seeing any braces shipped to

her and did not request any braces.  The other, Tyran Boler, received two but she stated that she

did not request the braces, did not need the braces and had never used them.

17.  Neither Boler nor Newton ever provided or authorized anyone to use their personal

identifying information to order or bill for braces on their behalf.  In the information provided

by Comfortland, both Boler's and Newton's name, address, date of birth, phone number, and

insurance provider is listed.  Bagley, through AMS, provided this information to Comfortland to

facilitate the shipping of braces and subsequently used this information to fraudulently bill

UnitedHealthcare (Boler and Newton's insurance).

### Doctor Interviews

18.  In an interview on February 1, 2018 in Los Angeles, California, Dr. Daniel Fung

described being provided an email solicitation by his business partner.  The solicitation was from

Matthew Palacios representing a company called United Health Solutions.  Fung responded to the

solicitation at matt@uhsn.co about the opportunity.  Fung described himself as a young doctor

with a family looking to pick up extra consulting work on the side.  Palacios told Fung the job

9

was to do tele-medicine chart reviews for compounding creams and braces. Fung never prescribed any compounding creams. Palacios stated all the patients had already been seen by either their chiropractor, physical therapist, or primary doctors and were approved for the braces. Palacios said the patients were approved, however because they lived in rural areas it would be difficult for them to get back to their doctors in order to get the prescriptions, therefore Fung was needed to issue them. Fung did a google search on the company and thought it appeared legitimate with a headquarters in Delaware.

19. Fung did a training session with Palacios over the phone which taught Fung to use a web portal provided by Palacios. About a week after the training, Fung received his first batch of records. Palacios always emailed Fung when he sent a new batch of records to read and review. The records consisted of portal pages with the patient's name, date of birth, full insurance information, and fees such as whether they were in network. The records contained small boxes to select if the patient suffered knee or back pain. The type of device the patient was receiving was already populated. Fung's job was to decide which size brace was appropriate based on the patient's height and weight. The portal had a list of sizes and items that Fung was to select. Some of the records would have a specific diagnosis listed, however if they did not have one Fung would click the box for knee or back pain. He would do this because Palacios told him this is what the patients suffered from.

20. After receiving his first batch of records, Fung asked Palacios why there were no doctors notes attached for him to review. Fung stated that this was different from other tele-medicine consulting he had done in the past. Palacios told him it was not necessary because the patient's insurance company had already reviewed the physician notes and approved them for the

10

device. This was not true, as the insurance company had not pre-approved the patients for the devices. When Fung first started, he contacted approximately ten to fifteen patients by telephone. He limited his questions to their height and weight. He did not verify with the patient if they had any medical conditions that would necessitate their need for a prescription brace. Fung estimates he took about five minutes to review the typical record and was paid fifteen dollars per record. The records each had a button he would click to authorize the prescription. Fung did not maintain any records related to his prescribing and estimates he wrote approximately 1800 prescriptions. In June of 2017, Fung was contacted by an investigator with Aetna insurance about one of his prescriptions. After this, he emailed Palacios but never got a response. Shortly afterwards all the consults stopped. Fung never received a W-2 or 1099 from Palacios, but in all estimates, he was paid approximately $27,500.

21.    On February 26, 2018, agents interviewed Dr. Mack Sheraton, an emergency physician practicing and residing in Pennsylvania. Sheraton was contacted by Matthew Palacios on LinkedIn regarding a job opportunity for tele-medicine with his company United Health Services (UHS). Sheraton was told UHS had nurse practitioners evaluating patient's access to their medical needs. His job would be to go through their charts and approve prescriptions for braces. Palacios also mentioned lidocaine creams, however Sheraton never prescribed those.

22.    Sheraton primarily communicated with Palacios by email and when he called the number, Palacios provided there was never an answer. Sheraton was given a contract to sign, asked to provide a voided check, and possibly a copy of his medical licenses. He would access the patient charts through a web portal Palacios provided. The portal contained the patient name, symptom, how long they had the condition, and the kind of brace requested. He assumed the

11

nurse practitioner (NP) had added the information, but the record did not contain the NP's name.
Sheraton was led to believe that someone had met with the patient and evaluated them for the
brace.   There was often history there, so he thought they had been measured and fitted.   During
an initial interview call, Palacios told him the patients had been evaluated.   Sheraton admits he
never saw any documentation showing medical necessity, no patient vitals or evidence of a
physical exam.   The recommendation for the braces was already populated in the records.

23.   A patient in North Carolina described as irate, contacted Sheraton directly.   The
patient complained about the braces not doing anything to help with pain.   Sheraton is only
licensed to practice medicine in Pennsylvania, Ohio, West Virginia, and Michigan.   Until this
time, he believed all the patients he had been prescribing for were located in one of these states.
Palacios had asked him what states he was licensed in and he had provided a copy of his licenses.
He pointed out that he was not licensed in North Carolina and Palacios told him he only needed to
be licensed in the state he was writing in.   Palacios told him about the Stark law and how tele-
medicine worked.   Palacios seemed to be knowledgeable about the law.

24.   Sheraton first started by reviewing only ten charts at a time and being paid about $500
a month. The number increased every month until he was reviewing thirty to thirty-five charts a
day four to five days a week.   His pay was up to $2500 a month by then.   Sheraton estimates in
all he wrote between two and three thousand prescriptions for Palacios.

25.   In May or June 2017, he was contacted by another irate customer that prompted him
to look more closely at Palacios' operation.   He terminated his relationship with Palacios in July
2017.   He asked for a 1099 but never received one.   After his resignation, he had his lawyer send
a cease and desist letter to UHS telling them not to use his name or credentials on any charts.   He

12

received a letter in return saying they would not.   Sometime in July 2017, a woman from Humana insurance asking him questions about his prescriptions contacted him. He told Palacios about the call from Humana Insurance saying they were receiving claims from numerous DME companies. Palacios explained that the various companies were all his subsidiaries.

26.   UHS made payments to Sheraton via direct deposit to his bank account.   The deposits came from different medical supply companies.   Sheraton reviewed his bank statements and said his deposits came from the following:

March 2017 – Medical Equipment USA

April 2017 – Medical Equipment USA

May 2017 – Atlanta Medical Supplies

June 2017 – Atlanta Medical Supplies

July 2017 – Atlanta Medical Supplies

27.   Dr. Darla Logan, who resides and practices in Scottsdale, Arizona, was located and interviewed.   She explained that a colleague of hers, Dr. Elizabeth Camp, contacted her and asked that she serve as a medical director for her.   Camp was working for a company called UHS doing chart reviews online.   Camp told her the company had recently changed their policy and she would now need a medical director to oversee her work on a periodic non-prescriptive basis.   Logan would be available for consultations as needed, but Camp would be the one actually doing the chart reviews.

28.   Logan's understanding was that the charts were for non-prescriptive over the counter type braces.   Camp would review the medical information to ensure that the devices were reasonable.   Information was to be given to a non-medical employee then passed to Camp for

13

review. Logan did not think any medical history was given. Logan stated it was her understanding that these patients were referred to UHS, but did not know exactly how the referrals came in. Logan was not sure how often Camp was reviewing charts for UHS. Camp paid Logan $350 a month to serve as medical director.

29. At some point, Logan's office began receiving phone calls from insurance companies asking for medical records. Initially, she thought this was a mistake but later the calls became more specific and were referencing braces. The person that both she and Camp had communicated with at UHS was Matt Palacios, so she passed this information to him. Logan never reviewed any charts or approved any braces. She denies approving any prescriptions and never had any knowledge of braces being prescribed under her name. She believes Camp severed her relationship with UHS in July of 2017.

30. Dr. Elizabeth Camp, who resides in Norman, Oklahoma, was interviewed. In 2016, Camp received an email solicitation looking for physicians to do chart reviews for home health devices. She responded and subsequently received a call from Matthew Palacios. Palacios told her that his company gets referrals for people interested in braces for their knees, back, and ankles. His team consists of an intake person who inquires as to where the person has pain. Once this information is collected, they pass it on to a physician who will review the intake chart and decide if the brace is appropriate. Palacios set Camp up with a web portal login and she was to be paid $15 for each chart reviewed.

31. When Camp would login to the portal, she would see the intake that contained the patient's name, date of birth, and their answers to some predesigned questions. Camp would then select a button to approve the braces. She began by reviewing about twenty-five charts in the first

14

three days but then started returning a lot of them because they did not have the intakes filled out. Camp felt without the intakes being completed there was not enough information for her to determine whether the need for the brace was reasonable. Camp would usually login every morning and review about ten to twelve charts. Some of the charts she reviewed would occasionally ask for approval for as many as ten different devices all at once, but she would decline those requests. Other times, she would deny the device if it did not seem relevant to their complaint such as a request for a knee brace when a patient was complaining about wrist pain.

32. A few weeks after Camp started, Palacios called her and said, "you are not in PECOS, you are not approved to do Medicare." (Agent note: PECOS is the Medicare, Provider, Enrollment, Chain, and Ownership System.) Camp told him she was not a Medicare provider. Palacios said they were not doing Medicare, but the insurance companies will not pay if you are not in PECOS. Camp filled out a PECOS application but was denied because she checked a box saying she would not be billing Medicare. Then, Camp asked Palacios if she could get a medical director that had a PECOS, number if that would allow her to keep working. Palacios was aware of others that had done this, so he agreed. This is when Camp contacted her friend and former student, Dr. Darla Logan. Logan agreed and Camp was able to continue.

33. Camp began reviewing approximately twenty to thirty charts a day. When she logged into the portal, it did not say anything about her approval being a prescription. When she first worked for Palacios, all of the approvals were under her name, but when Logan began as her medical director Logan's name started showing up on the approvals. Camp assumed this was appropriate because she was serving as medical director.

34. The records she reviewed had no patient insurance listed that she could see.

15

Primarily, she had the patient's name, city, state, date of birth, and sometimes a telephone number. There would also be a medical device requested. Camp could not change or alter the type of device, just approve or deny it. There were times where she would approve multiple devices all at once if she felt it was appropriate. Camp assumed the braces were over the counter because she was only determining if it was reasonable. Palacios told her it was only reasonableness she was determining. At no time, did anything ask her to determine medical necessity.

35. Over the time Camp worked for Palacios, she was constantly under paid. When she finally stopped working for Palacios, he owed her more than $30,000 in back pay. She felt it was always a struggle to be paid. He was always telling her they were changing banks or we are having cash flow problems with claims not being paid. When she was paid, it would be from all different banks. On one occasion near the end of her employment, she threatened to sue Palacios if he did not pay her what she was owed. He responded by telling her to go ahead because they were located out of the country. This was when Camp became aware that UHS was not located in the United States. Palacios followed this up with telling her if she would approve sixty charts on the spot he would agree to pay her 20% of what she was owed. Camp refused this offer.

36. Based on the facts set forth in this affidavit, there is probable cause to believe that MATTHEW ALAN BAGLEY, aka MATTHEW ALAN BAGLEY PALACIOS did commit Healthcare Fraud and Conspiracy to Commit Healthcare fraud in violation of Title 18, United States Code, Sections 1347 and 1349, Conspiracy to Commit Money Laundering in violation of Title 18, United States Code, Section 1956(h) and Aggravated Identity Theft in violation of Title 18, United States Code, Section 1028A(a)(1).

16

# EXHIBIT B

Secretary of State Office
500 E Capitol Ave
Pierre, SD  57501
(605)773-4845
corpinfo@state.sd.us

# APPLICATION FOR AMENDED
# ARTICLES OF ORGANIZATION
### DOMESTIC LIMITED LIABILITY COMPANY
SDCL 47-34A-204

**Please Type or Print Clearly in Ink**
**Please submit one Original and one Photocopy**
### FILING FEE: $60 payable to SECRETARY OF STATE

The Limited Liability Company named below, adopts the following Amended Articles of Organization pursuant to SDCL 47-34A-204.

1. The Name and Business ID of the company is:

   M USA Group 3                                              DL138095
   Name (Note: This must be the exact limited liability company name as registered.)        Business ID

2. The date of filing the original Articles of Organization 10/05/2017

3. The amendment to the Articles is:

   Replacement of Jeaneliza Ebetuer with Apollo Arcallana as Manager of M USA Group 3
   and declaration of 100% benificial owner is Matthew Palacios Bagley.

The application must be signed by a member if the company is a member-managed company or by a manager if it's a manager managed company or in accordance with SDCL 47-34A-205.

No person may execute this report knowing it is false in any material respect.  Any violation may be subject to a criminal penalty (SDCL 22-39-36).

Dated  1/9/2018

Email _____
          (Optional)

Signature of an authorized person

Apollo Arcallana
Printed Name

Manager
Title

B0047-7568 01/11/2018 9:46AM Rec'd by SD SOS

# State of South Dakota

## Office of the Secretary of State

## Certificate of Amendment

### Domestic Limited Liability Company

**I, Shantel Krebs,** Secretary of State of the State of South Dakota, hereby certify that the Application for Articles of Amendment to the Articles of Organization for

## M USA GROUP 3

### BUSINESS ID# DL138095

with an effective date of: January 11, 2018, duly signed and verified, pursuant to the provisions of the South Dakota Limited Liability Company Act, has been received in this office and is found to conform to law.

**ACCORDINGLY,** and by virtue of the authority vested in me by law, I hereby issue this Certificate of Amendment and attach hereto a duplicate of the Application for Articles of Amendment to the Articles of Organization.



**IN TESTIMONY WHEREOF,** I have hereunto set my hand and caused to be affixed the Great Seal of the State of South Dakota, in Pierre, the Capital City, this day, January 11, 2018.

*Shantel Krebs*

**Shantel Krebs**
**Secretary of State**

01/11/2018 10:30 AM

# *South Dakota Secretary of State*
## SHANTEL KREBS

M USA GROUP 3
1489 W WARM SPRINGS RD
HENDERSON, NV  89014

January 11, 2018

## Filing Acknowledgment

Please review the filing information below and notify our office immediately of any discrepancies.

**Business ID :**  **DL138095**
Status:            Good Standing
Filing Type:       Limited Liability Company - Domestic
Amendment Type: Articles of Amendment
Filed Date:        01/11/2018 9:46 AM

Shantel Krebs
Secretary of State
State of South Dakota

SOUTH DAKOTA STATE CAPITOL  •  500 E. CAPITOL AVE.  •  PIERRE, SD 57501
www.sdsos.gov  •  Phone 605 773 4845  •  Fax 605 773 4550
corpinfo@state.sd.us

Home | Forms | Announcements | FAQ | Contact Us

# NEVADA SECRETARY OF STATE
### Barbara K. Cegavske

Search nvsos.gov..........  GO

SOS INFORMATION | ELECTIONS | BUSINESSES | LICENSING | INVESTOR INFORMATION | ONLINE SERVICES

My Data Reports   Commercial Recordings   Licensing

## M USA GROUP 3, LLC

Q New Search          Manage this Business     $ Calculate List Fees     🖶 Printer Friendly

### Business Entity Information

| | | | |
|---|---|---|---|
| Status: | Default | File Date: | 10/10/2017 |
| Type: | Foreign Limited-Liability Company | Entity Number: | E0481112017-7 |
| Qualifying State: | SD | List of Officers Due: | 10/31/2018 |
| Managed By: | | Expiration Date: | |
| NV Business ID: | NV20171653771 | Business License Exp: | 10/31/2018 |

### Registered Agent Information

| | | | |
|---|---|---|---|
| Name: | M USA GROUP 3, LLC c/o MANAGER | Address 1: | 1489 W. WARM SPRINGS RD. STE 110 |
| Address 2: | | City: | HENDERSON |
| State: | NV | Zip Code: | 89014 |
| Phone: | | Fax: | |
| Mailing Address 1: | | Mailing Address 2: | |
| Mailing City: | | Mailing State: | NV |
| Mailing Zip Code: | | | |
| Agent Type: | Noncommercial Registered Agent | | |

View all business entities under this registered agent

### Financial Information

| | | | |
|---|---|---|---|
| No Par Share Count: | 0 | Capital Amount: | $ 0 |

No stock records found for this company

### [ − ] Officers                                            ⊞ Include Inactive Officers

**Manager - APOLLO MARCOS ARCALLANA**

| | | | |
|---|---|---|---|
| Address 1: | 863 LA SENDA WAY | Address 2: | |
| City: | CHULA VISTA | State: | CA |
| Zip Code: | 91910 | Country: | |
| Status: | Active | Email: | |

### [ − ] Actions\Amendments

Click here to view 4 actions/amendments associated with this company

# EXHIBIT C

**Visit Us at the Following Trade Shows:**

**2018 Career Education Colleges
and Education Convention**
June 4–6, 2018
Dolphin Resort, Orlando, Florida

**CCW Customer Contact Week**
June 18 – 22, 2018
The Mirage, Las Vegas

**2018 Bridge Conference**
July 31, 2018, August 2, 2018
Gaylord National Resort & Convention Center
201 Waterfront St, Oxon Hill

# ELECTRIFY YOUR LEADS!

We are a full call center specializing in customer support and lead marketing for the education, publishing and business verticals.

REGISTER FOR A FREE DEMO    FREE TRIAL OFFER    BOOST QUALIFYING VERTICALS

## Marketing and Support Services


**Call Center**


**Education**


**Fundraising**

## Real-time Leads and Live Transfers


**Medicare Insurance**


**Health Insurance**


**Auto Insurance**

## Avatar Technology



Avatar-assisted dialers let your call center agents interface quickly and deliver professional phone calls. A dialer-to-talk interface using pre-recorded messages lets non-native English-level complete conversations without accented English. Now, two domestic agents can quickly interface from a native speaker. And because the message is recorded, you can let your team take every time.

Avatar's animated screen agent is on the call and help them stay productive. With the revolutionary technology, agents rely on visual cues to know where they are on the call flow, so they deliver the right message at the right time. Register now to see our self-production screens and how easy they are to use!

## Remote Medical Staff



Attends Live supports Remote Medical Staff to handle remote work providers. Attends Live is HIPAA-trained, with experienced in the operations of a medical office and an expert in providing top-level medical services — with the typical practice, mental health, physical therapy and more. Attends Live helps in ringful and board your staff into a dedicated medical line, saving you the time of service cost.

### Physician Benefits

Attends Live's staff is trust. They join professional staff members to a seamless office workflow. With dedicated remote office's optimal medical staff when supplement is best, administrative and complete tasks take a virtual environment that is fully HIPAA-compliant. Attends works staff in summarizes your patient records of patient care from records, processes the records employees, patient billing and retrieval, provide informational office, and record the information — a cost-effective remote payroll.

### RMS Duties

Attends Live's RMS does more than just administrative work. In addition to all the dispatch, regular and complete tasks you'll expect, RMS provide to all-time management of social services and marketing. Typical RMS tasks include:

- Transcription
- Pre-certification
- Scheduling
- Auto Entry
- Billing
- Patient Follow-up
- Appointment Verification
- Pre-authorization Services
- Mailings
- Coding
- Data Management
- Call Handling
- More

## Enable Flash To See an Avatar Demo

## AiMedia Overview

Learn about avatar technology and AiMedia's offering.



## Demo Call

See an avatar in action.



## Solutions



**Animated Avatars**

Animated avatars execute quality pitches at affordable prices.



**Hosted Closers**

Multi-stage call process puts the right agent in the right place to close your deal.



**Live Lead Transfer**

Get hot prospects transferred live to your own closers.



### Integration

AiMedia works, seamlessly integrates with a wide range of tools, solutions, and technologies that meets your requirements and fitting seamlessly into your workflow. Their customer AiMedia lets you take lead and takes care to correlate your data being provided across CRM and lead management systems. Full flexibility allows customization and let's create a solution that works, like the platform, when it comes to reporting, AiMedia offers on the aloves worked with custom requirements.



### Verticals

AiMedia provides many campaign services people for exceeds. Are top ones available in the following industries:

Insurance
Healthcare
Auto
Solar
Mortgage/Finance
Travel and Bus.
Education
Financial Serv.
Non-Profits
E-Commerce
COVID Registration and Bookings.
Aging of Campaigns
Home Security
Home Improvement
Healthcare Leads
Multiple Suppliers to Multiple Lead Buyer
Business Support Serv.
Website Leads

## CHOOSE YOUR PRICE
AIMEDIA OFFERS VARIOUS PRICING MODELS TO SUIT YOUR PROCESS.

| PAY PER HOUR | PAY PER LEAD | PAY PER ACQUISITION |
|---|---|---|
| You pay for every agent hour logged. | You pay when a prospect indicates interest. | You pay when someone buys. |
| REGISTER NOW FOR 1 WEEK TRIAL | REGISTER NOW FOR 1 WEEK TRIAL | REGISTER NOW FOR 1 WEEK TRIAL |



COPYRIGHT © 2020, ALL RIGHTS RESERVED.
2711 LAKESHORE BLVD W TORONTO CANADA M8V0G9

# EXHIBIT D



# State of California
## Secretary of State



**E-561680**

**FILED**

In the office of the Secretary of
State of the State of California

**May - 13 2008**

This Space For Filing Use Only

### STATEMENT OF INFORMATION
(Domestic Stock and Agricultural Cooperative Corporations)

**FEES (Filing and Disclosure): $25.00.  If amendment, see instructions.**

**IMPORTANT - READ INSTRUCTIONS BEFORE COMPLETING THIS FORM**

---

**1. CORPORATE NAME** (Please do not alter if name is preprinted.)

C3087921

NATIONAL CALL CENTER SERVICES, INC.

4660 LA JOLLA VILLAGE DR.  SUITE 500
SAN DIEGO   CA 92122

**S**

**DUE DATE:**

**COMPLETE ADDRESSES FOR THE FOLLOWING** (Do not abbreviate the name of the city. Items 2 and 3 cannot be P.O. Boxes.)

| | CITY | STATE | ZIP CODE |
|---|---|---|---|
| 2. STREET ADDRESS OF PRINCIPAL EXECUTIVE OFFICE | | | |
| 4660 LA JOLLA VILLAGE DR.  SUITE 500  SAN DIEGO   CA  92122 | | | |
| 3. STREET ADDRESS OF PRINCIPAL BUSINESS OFFICE IN CALIFORNIA, IF ANY | | | |
| 4660 LA JOLLA VILLAGE DR.  SUITE 500  SAN DIEGO   CA  92122 | | | |
| 4. MAILING ADDRESS OF THE CORPORATION, IF DIFFERENT THAN ITEM 2 | | | |
| 4660 LA JOLLA VILLAGE DR.  SUITE 500  SAN DIEGO   CA 92122 | | | |

**NAMES AND COMPLETE ADDRESSES OF THE FOLLOWING OFFICERS** (The corporation must have these three officers.  A comparable title for the specific officer may be added; however, the preprinted titles on this form must not be altered.)

| | ADDRESS | CITY | STATE | ZIP CODE |
|---|---|---|---|---|
| 5. CHIEF EXECUTIVE OFFICER/ | | | | |
| APOLLO MARCOS ARCALLANA  863 LA SENDA WAY   CHULA VISTA, CA 91910 | | | | |
| 6. SECRETARY/ | | | | |
| APOLLO M ARCALLANA  863 LA SENDA WAY   CHULA VISTA, CA 91910 | | | | |
| 7. CHIEF FINANCIAL OFFICER/ | | | | |
| APOLLO M ARCALLANA  863 LA SENDA WAY   CHULA VISTA  CA 91910 | | | | |

**NAMES AND COMPLETE ADDRESSES OF ALL DIRECTORS, INCLUDING DIRECTORS WHO ARE ALSO OFFICERS** (The corporation must have at least one director.  Attach additional pages, if necessary.)

| | ADDRESS | CITY | STATE | ZIP CODE |
|---|---|---|---|---|
| 8. NAME | | | | |
| APOLLO M ARCALLANA     863 LA SENDA WAY   CHULA VISTA, CA 91910 | | | | |
| 9. NAME | | | | |
| 10. NAME | | | | |

**11.  NUMBER OF VACANCIES ON THE BOARD OF DIRECTIONS, IF ANY:  3**

**AGENT FOR  SERVICE OF PROCESS**  (If the agent is an individual, the agent must reside in California and Item 13 must be completed with a California street address (a P.O.Box address is not acceptable).  If the agent is another corporation, the agent must have on file with the California Secretary of State a certificate pursuant to Corporations Code section 1505 and Item 13 must be left blank.)

**12. NAME OF AGENT FOR SERVICE OF PROCESS**

APOLLO MARCOS ARCALLANA

**13. STREET ADDRESS OF AGENT FOR SERVICE OF PROCESS IN CALIFORNIA, IF AN INDIVIDUAL**     CITY     STATE     ZIP CODE

863 LA SENDA WAY   CHULA VISTA, CA 91910

**TYPE OF BUSINESS**

**14. DESCRIBE THE TYPE OF BUSINESS OF THE CORPORATION**

BUSINESS SOFTWARE

**15. BY SUBMITTING THIS STATEMENT OF INFORMATION TO THE CALIFORNIA SECRETARY OF STATE, THE CORPORATION CERTIFIES THE INFORMATION CONTAINED HEREIN, INCLUDING ANY ATTACHMENTS, IS TRUE AND CORRECT.**

| 05/13/2008 | APOLLO M ARCALLANA | PRESIDENT | |
|---|---|---|---|
| DATE | TYPE OR PRINT NAME OF PERSON COMPLETING THE FORM | TITLE | SIGNATURE |

SI-200 C (REV 01/2008)                                                                APPROVED BY SECRETARY OF STATE



# State of California
## Secretary of State



**E-556369**

**FILED**

In the office of the Secretary of
State of the State of California

**May - 4 2008**

This Space For Filing Use Only

### STATEMENT OF INFORMATION
(Domestic Stock and Agricultural Cooperative Corporations)

**FEES (Filing and Disclosure): $25.00. If amendment, see instructions.**
**IMPORTANT - READ INSTRUCTIONS BEFORE COMPLETING THIS FORM**

| | |
|---|---|
| 1. CORPORATE NAME (Please do not alter if name is preprinted.) | **S** |

C3086254
NATIONAL TELEMEDICINE CENTER INC.

402 WEST BROADWAY SUITE 400
SAN DIEGO  CA 92101

**DUE DATE:**

**COMPLETE ADDRESSES FOR THE FOLLOWING** (Do not abbreviate the name of the city. Items 2 and 3 cannot be P.O. Boxes.)

| 2. STREET ADDRESS OF PRINCIPAL EXECUTIVE OFFICE | CITY | STATE | ZIP CODE |
|---|---|---|---|
| 402 WEST BROADWAY SUITE 400   SAN DIEGO  CA  92101 | | | |

| 3. STREET ADDRESS OF PRINCIPAL BUSINESS OFFICE IN CALIFORNIA, IF ANY | CITY | STATE | ZIP CODE |
|---|---|---|---|
| 402 WEST BROADWAY , SUITE 400   SAN DIEGO  CA 92101 | | | |

| 4. MAILING ADDRESS OF THE CORPORATION, IF DIFFERENT THAN ITEM 2 | CITY | STATE | ZIP CODE |
|---|---|---|---|
| 402 WEST BROADWAY SUITE 400   SAN DIEGO CA 92101 | | | |

**NAMES AND COMPLETE ADDRESSES OF THE FOLLOWING OFFICERS** (The corporation must have these three officers.  A comparable title for the specific officer may be added; however, the preprinted titles on this form must not be altered.)

| 5. CHIEF EXECUTIVE OFFICER/ | ADDRESS | CITY | STATE | ZIP CODE |
|---|---|---|---|---|
| APOLLO M. ARCALLANA  863 LA SENDA WAY   CHULA VISTA, CA 91910 | | | | |

| 6. SECRETARY/ | ADDRESS | CITY | STATE | ZIP CODE |
|---|---|---|---|---|
| APOLLO MARCOS ARCALLANA 863 LA SENDA WAY   CHULA VISTA, CA 91910 | | | | |

| 7. CHIEF FINANCIAL OFFICER/ | ADDRESS | CITY | STATE | ZIP CODE |
|---|---|---|---|---|
| APOLLO MARCOS ARCALLANA 863 LA SENDA   CHULA VISTA  CA 91910 | | | | |

**NAMES AND COMPLETE ADDRESSES OF ALL DIRECTORS, INCLUDING DIRECTORS WHO ARE ALSO OFFICERS** (The corporation must have at least one director.  Attach additional pages, if necessary.)

| 8. NAME | ADDRESS | CITY | STATE | ZIP CODE |
|---|---|---|---|---|
| APOLLO MARCOS ARCALLANA   863 LA SENDA WAY   CHULA VISTA, CA 91910 | | | | |

| 9. NAME | ADDRESS | CITY | STATE | ZIP CODE |
|---|---|---|---|---|
| | | | | |

| 10. NAME | ADDRESS | CITY | STATE | ZIP CODE |
|---|---|---|---|---|
| | | | | |

11. NUMBER OF VACANCIES ON THE BOARD OF DIRECTIONS, IF ANY:  3

**AGENT FOR SERVICE OF PROCESS** (If the agent is an individual, the agent must reside in California and Item 13 must be completed with a California street address (a P.O.Box address is not acceptable).  If the agent is another corporation, the agent must have on file with the California Secretary of State a certificate pursuant to Corporations Code section 1505 and Item 13 must be left blank.)

| 12. NAME OF AGENT FOR SERVICE OF PROCESS |
|---|
| APOLLO MARCOS ARCALLANA |

| 13. STREET ADDRESS OF AGENT FOR SERVICE OF PROCESS IN CALIFORNIA, IF AN INDIVIDUAL | CITY | STATE | ZIP CODE |
|---|---|---|---|
| 863 LA SENDA WAY   CHULA VISTA, CA 91910 | | | |

**TYPE OF BUSINESS**

| 14. DESCRIBE THE TYPE OF BUSINESS OF THE CORPORATION |
|---|
| CUSTOMIZED COMPUTER SOFTWARE |

15. BY SUBMITTING THIS STATEMENT OF INFORMATION TO THE CALIFORNIA SECRETARY OF STATE, THE CORPORATION CERTIFIES THE INFORMATION CONTAINED HEREIN, INCLUDING ANY ATTACHMENTS, IS TRUE AND CORRECT.

| 05/04/2008 | APOLLO MARCOS ARCALLANA | PRESIDENT | |
|---|---|---|---|
| DATE | TYPE OR PRINT NAME OF PERSON COMPLETING THE FORM | TITLE | SIGNATURE |

| SI-200 C (REV 01/2008) | APPROVED BY SECRETARY OF STATE |
|---|---|

# EXHIBIT E

RECRUITER Lite            PROJECTS   CLIPBOARD   JOBS   REPORTS   MORE

Start a new search                                           Advanced • Saved / History

Profiles from Search                        1 of 42   >      **Recruiting Tools**



### Apollo Arcaliana
To obtain a position in the accounting field within the
company that will allow to utilize my skills. H. 619
6365280

Chula Vista, California, United States | Accounting

Previous positions:
Accounting Supervisor at Ultimate Energy Systems and Trading Services,
Inc.

Education:
St. Mary's College of Catbalogan (Formerly Sacred Hearth College),
Bachelor of Science in Commerce, Accounting

[ Send InMail ]  ▾

In Contact info    ✏ Edit                          Public Profile

Recruiting Activity

There is no activity associated with this profile.

Background

Experience

**Accounting Supervisor**

Ultimate Energy Systems and Trading Services, Inc.
March 2014 – October 2017 (3 years 7 months)
| NCR - National Capital Region, Philippines
As Accounting Supervisor in the company I am responsible for the preparation of financial reports and
recording the daily accounting activity, Government Compliance ( BIR, SSS, Philhealth, Pag-Ibig), review
the disbursement voucher of the company and other task giving by the management.

The Company is using the Quickbooks and ACOWIN systems.

Education

**St. Mary's College of Catbalogan (Formerly Sacred Hearth College)**
Bachelor of Science in Commerce, Accounting
1986 – 1993

Acolites and Societies
Member of Junior Philippine Institute of Accountants
Certificate - Basic Naval Citizen Military Training

Additional Info

**Contact for**
- Career opportunities
- Consulting offers
- New ventures
- Job inquiries
- Expertise requests
- Business deals
- Reference requests
- Getting back in touch

Skills & Expertise

• Knowledgeable in Quickbooks, ACOWIN, Peach, One world Accounting Systems

Following

**Companies**

                  ● La Jolla

Ultimate Integrated       La Jolla Pharmaceutical
Energy Solutions          Company




**Similar profiles**


**Anne Lasquety**
Leasing Assistant at MWM Terminals,
Inc.
Metro Manila, National Capital Region,
Philippines


**Maryjoce Ann Dator**
Technical Coordinator (Fund Accounting)
at Northern Trust Corporation
Metro Manila, National Capital Region,
Philippines


**Jaime Domingo**
Fund Controller at Partners Group
Metro Manila, National Capital Region,
Philippines


**Joseph Czar Dalson II, CPA**
Audit Supervisor - Financial Services at
KPMG Philippines
Quezon City, National Capital Region,
Philippines


**Joshua Manuel Magistrado**
Tax Associate at S&V & Co.
Mandaluyong, National Capital Region,
Philippines


**Gilson Pino**
Tax Senior Associate at EY
Lapu-Lapu, Central Visayas, Philippines


**Jessie James De Guzman**
Senior Audit Associate at EY
Metro Manila, National Capital Region,
Philippines


**Raymark Santos**
R2R Cluster Lead | R2R Ops Lead
Specialist (Expat in Malaysia)
Petaling Jaya, Selangor, Malaysia

**Jennabelle Sante**
SAE II at Commission on Audit
Metro Manila, National Capital Region,
Philippines

**Jayson Tagra**
Accounting Associate at Syip Gorres
Velayo & Co.
Metro Manila, National Capital Region,
Philippines

+90          More similar profiles

By using this site, you agree to LinkedIn's terms of use. Commercial use of this site without express subscription is prohibited.
LinkedIn Corporation © 2019   User Agreement | Privacy Policy | Copyright Policy | Support | Blog | Language | Send us your feedback

# EXHIBIT F

# Affidavit of Process Server

## DISTRICT COURT, JEFFERSON COUNTY, COLORADO
(NAME OF COURT)

A AAA CUSTOM PLUMBING CORPORATION, et al. vs TRIRX, LTD, et al.          10CV2346
PLAINTIFF/PETITIONER          DEFENDANT/RESPONDENT          CASE NUMBER

I, K. WYSONG_____, being first duly sworn, depose and say: that I am over the age of 18 years and not a party to this action, and that within the boundaries of the state where service was effected, I was authorized by law to perform said service.

**Service:** I served APOLLO M. ARCALLANA, INDIVIDUALLY
NAME OF PERSON / ENTITY BEING SERVED

with (list documents) ***SEE ATTACHED

by leaving with BEATRICE NANG          CO-OCCUPANT          At
NAME          RELATIONSHIP

☑ Residence 863 LA SENDA WAY          CHULA VISTA, CA 91910
ADDRESS          CITY / STATE

☐ Business_____          _____
ADDRESS          CITY / STATE

On____6/10/10____ AT____11:50AM____
DATE          TIME

☐ Inquired if subject was a member of the U.S. Military and was informed they are not.

Thereafter copies of the documents were mailed by prepaid, first class mail on_____
DATE

from_____
CITY          STATE          ZIP

**Manner of Service:**
☐ **Personal:** By personally delivering copies to the person being served.
☑ **Substituted at Residence:** By leaving copies at the dwelling house or usual place of abode of the person being served with a member of the household over the age of EIGHTEEN and explaining the general nature of the papers.
☐ **Substituted at Business:** By leaving, during office hours, copies at the office of the person/entity being served with the person apparently in charge thereof.
☐ **Posting:** By posting copies in a conspicuous manner to the front door of the person/entity being served.

**Non-Service:** After due search, careful inquiry and diligent attempts at the address(es) listed above, I have been unable to effect process upon the person/entity being served because of the following reason(s):

☐ Unknown at Address   ☐ Moved, Left no Forwarding   ☐ Service Cancelled by Litigant   ☐ Unable to Serve in Timely Fashion
☐ Address Does Not Exist  ☐ Other_____

**Service Attempts:** Service was attempted on: (1)_____ _____ (2)_____ _____
DATE          TIME          DATE          TIME

(3)_____ _____ (4)_____ _____ (5)_____ _____
DATE          TIME          DATE          TIME          DATE          TIME

**Description:** Age 70   Sex F   Race PHIL  Height 5'7"   Weight 160  Hair____ Beard____ Glasses____

_____
SIGNATURE OF PROCESS SERVER

SUBSCRIBED AND SWORN to before me this 14th day of June, 20 10, by K. WYSONG #879,
Proved to me on the basis of satisfactory evidence to be the person(s) who appeared before me.

_____
SIGNATURE OF NOTARY PUBLIC

MARK J. JENKINS
Commission No. 1844032
NOTARY PUBLIC - CALIFORNIA
SAN DIEGO COUNTY
My Comm. Expires April 10, 2013

NOTARY PUBLIC for the state of CALIFORNIA

FORM 2     NATIONAL ASSOCIATION OF PROFESSIONAL PROCESS SERVERS

Case 3:18-cv-02800-AJB-BLM Document 1 Filed 12/27/18 PageID.71 Page 71 of 80
Case 1:10-cv-01420-PAB-BNB Document 16 Filed 06/30/10 USDC Colorado Page 71 of 73
JUN 2 8 2010

MC-031

| PLAINTIFF/PETITIONER: A AAA Custom Plumbing Corporation, et al. | CASE NUMBER: |
|---|---|
| DEFENDANT/RESPONDENT: TRIRX, LTD, et al. | 10CV2346 |

## DECLARATION

*(This form must be attached to another form or court paper before it can be filed in court.)*

I, PETER JAMES ZIROLLI, AM A REGISTERED PROCESS SERVER AND AM EMPLOYED IN THE COUNTY OF SAN DIEGO. I AM AWARE OF THE FACTS PRESENTED BELOW. AFTER DUE AND DILIGENT EFFORT, I HAVE NOT BEEN ABLE TO EFFECT PERSONAL SERVICE ON THE BELOW-NAMED SUBJECT. A LIST OF DATES, TIMES AND ATTEMPTS AT SERVICE IS AS FOLLOWS:

SERVEE: NATIONAL TELEMEDICINE CENTER, INC., A CALIFORNIA CORPORATION

ADDRESS #1 - 402 W. BROADWAY, STE. 400, SAN DIEGO, CA 92101

ADDRESS #2 - 863 LA SENDA WAY. CHULA VISTA, CA 92101

SERVICE ATTEMPTS AND RESULTS:

5/24/10, 10:20AM - ADDRESS #1 - NOT IN. PER SECRETARY, NELDA, SUBJECT IS IN THE PHILIPINES AND IS NOT EXPECTED TO RETURN UNTIL AT LEAST THE FIRST WEEKEND OF JULY, 2010.

6/11/10, 7:07PM - NOT IN PER BEATRICE NANG. SUBSERVICE EFFECTED BY LEAVING WITH BEATRICE NANG, A FAMILY MEMEBER OVER THE AGE OF 18 (AUNT)/AUTHORIZED TO ACCEPT DOCUMENTS FOR REGISTERED AGENT, APOLLO ARCALLANA.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Date: 6/14/10

PETER JAMES ZIROLLI
(TYPE OR PRINT NAME)                                    (SIGNATURE OF DECLARANT)

☐ Attorney for   ☐ Plaintiff   ☐ Petitioner   ☐ Defendant
☐ Respondent   ☑ Other (Specify):
SAN DIEGO #2244

Form Approved for Optional Use
Judicial Council of California
MC-031 [Rev. July 1, 2005]

**ATTACHED DECLARATION**

Page 1 of 1

www.accesslaw.com

| SHORT TITLE: A AAA Custom Plumbing Corporation, et al. | CASE NUMBER: |
|---|---|
| VS. TRIRX LTD, et al. | 10CV2346 |

## ATTACHMENT TO PROOF OF PERSONAL SERVICE---CIVIL (DOCUMENTS SERVED)

The documents that were personally served are as follows *(describe each document specifically)*:

DISTRICT COURT CIVIL (CV) CASE COVER SHEET FOR INITIAL PLEADING OF COMPLAINT, COUNTERCLAIM CROSS-CLAIM OR THIRD PARTY COMPLAINT

CIVIL COVER SHEET NOTICE

SUMMONS

COMPLAINT

EXHIBITS

ATTACHMENT TO PROOF OF PERSONAL SERVICE—CIVIL
(Documents Served)

Page 1 of 1

www.accesslaw.com

# EXHIBIT G



glassdoor

Licensed Medicare Insurance Sales for Inbound Sales Ear | Jobs | Fort Lauderdale, FL

G Sign in to glassdoor.com with Google

Toni Smithinson
seoresearchdata@gmail.com

Doe John
sddtronevideos@gmail.com

### Licensed Medicare Insurance Sales for Inbound Sales Earn 100k ++ per year plus Residuals

3.9   NATIONAL INSURANCE USA GROUP LLC – Fort Lauderdale, FL

Apply on Partner Site

**Save**

30+ days ago

Job

**Job Description**

100% Inbound Live Transfers, Pre-Qualified for Medicare Supplement. We pay weekly and give Full residual: You will have more calls than you can handle. We have the leads

National Insurance USA Group.

The over 65 market is still BOOMING and is the fasted growing segment of our society. At National Insurance USA the Average agent sells 2 policies per day and the Stars MORE. With our comprehensive lead and customer qualification program you will speak to Customers all day long TWELVE MONTHS A YEAR, who want speak to YOU about a Supplement policy. Are you Articulate and Confident on the phone and willing to work 40 hours a week? You will have UNLIMITED INBOUND LEADS and will make the money you always wanted to.

National Insurance USA will take a Licensed in Florida Agent and get you Licensed in Multiple States, we sell into the best markets. We will cross sell to your clients and you will get a commission share just because they are YOUR CLIENT.

IF you are good on the phone we will make you great, If you are average we will make you very good, if you are ok we will make you good and if you are GREAT we will make you a STAR.

At NATIONAL INSURANCE USA, it is all about the SYSTEM and the LEADS; No one has a better System!!

Job Type: Full-time

Salary: $100,000.00 ++ potential

Get alerts to jobs like this, to your inbox.   **Create Job Alert**

Similar Jobs You May Like                                                        See More Jobs

Glassdoor has millions of jobs plus salary information, company reviews, and interview questions from people on the inside making it easy to find a job that's right for you.

Glassdoor

About / Press
Awards
Blog
Research

Employers

Get a Free Employer Account
Employer Center
Post a Job

Community

Help / Contact Us
Guidelines
Terms of Use
Privacy & Cookies

Work With Us

Job Boards
Advertisers
Developers
Careers

Download the App

United States

Browse by:   Companies, Jobs, Locations

Copyright © 2008-2018, Glassdoor, Inc. "Glassdoor" and logo are proprietary trademarks of Glassdoor, Inc.

Start a new search

Advanced · Saved / History



### Steve Erlich
2d
ReturnMarketing, Inc.
Davie, Florida, United States | Marketing and Advertising

Previous positions
CEO at MonetizeNet, LLC
VP sales and bus. dev. at ThinkingCraft

Education
Florida Atlantic University, Graduate Studies, MBA

[Send InMail]   [Add to clipboard]

Contact Info    Edit              Company Website   Public Profile

Recruiting Activity

There's no activity associated with this profile

Background

#### Summary

I am the founder and President, of ReturnMarketing, Inc., an email marketing, and data and traffic monetization company specializing in email, phone postal and other offline data as well as Lead generation and conversion enhancement. We bang in between 500,000 and 1 million opt-in email records per day into our system. Approximately 45% of them have full postal addresses and between 15 - 25% have phone numbers.

Further, I am the founded MonetizeNet, LLC. MonetizeNet was a similar company to ReturnMarketing. I closed MonetizeNet because of tax reasons with my former partners.

I started in Internet marketing in 1995 and founded my own company (RCINetwork) in 2000. When RCINetwork was sold to Equifax in 2005 it was a top 10 email marketing company in the world. I worked as a consultant in the email and online marketing space until I started ReturnMarketing.

Prior to my career in online marketing I was in the commercial Real Estate developing and selling 29 small office buildings. Further I owned and operated a 310 seat sports bar restaurant/nightclub, which I sold after 2 years. I graduated with a BA in Finance from Florida Atlantic University.

Specialties:
1. Email Marketing and Data and Traffic Monetization worldwide, with a multi-channel approach of email, Phone, Postal, and other offline data.
2. Data Sales for phone, smart and postal data.
3. Lead generation and Brokering.

#### Experience

### President
ReturnMarketing, Inc.
August 2006 – Present (10 years 4 months)

Company management and overseeing Data Monetization and email Marketing.

### CEO
MonetizeNet, LLC
February 2008 – April 2018 (3 years 2 months) | Hollywood, Florida

MonetizeNet, LLC creates a revenue stream for our partners/clients from traffic and data generated online. We work with email, phone, postal, and other offline data to create additional revenues with zero effect on a companies primary revenue stream. "Risk Free Revenue" those additional revenues go straight to the bottom line.

Recommendations (2)

### VP sales and bus. dev.
ThinkingCraft
2006 – 2008 | Hollywood, Florida

Sales and Business Development

### Owner & Founder
RciNetwork, LLC
March 2000 – February 2005 (4 years 11 months) | Del Ray Beach, Florida
eMail Marketing company was 5th largest at the time of sales in 2004.

#### Education

### Florida Atlantic University
Graduate Studies, MBA
1980 – 1982



### Florida Atlantic University
BA, Finance
1979 – 1980

School and Played Rugby

Activities and Societies
Rugby

## Recruiting Tools

### Similar profiles


**Joel Albrizio**
2nd
Bad-Adz Digital Over 27,500 Followers
Boston, Massachusetts, United States

**Mike Ellinian**
2nd
CEO-Founder at Digital Octech
IncRedProtectOne.com
Los Angeles, California, United States


**Hank Blank**
2nd
Agency Reviews| Staffing | Speaker |
Blogger/ New Business Development |
Digital Solutions/ Networks and
Connector,
Laguna Niguel, California, United States


**Gil Carlson**
2nd
President at Blue Planet Project
Hampton, Virginia, United States

**LG Jaeger**
2nd
President / Founder at Sponsor Burst,
Inc
Cleveland, Ohio, United States

+ 55     More similar profiles

### People also viewed


**Richard Tazjefl**
2nd
Technology and marketing entrepreneur,
Scottsdale, Arizona, United States


**Jon Noble**
2nd
CEO - Helston Interactive, LLC.Rcolarac
Affiliate Network
Plantation, Florida, United States


**Mike Williams**
2nd
★ Leader ★ Executor ★ Marketer
Saanich, British Columbia, Canada


**Wes Eads**
2nd
Online Publisher Specializing in
Customer Acquisition & Lead Generation
Culver City, California, United States


**Randy Blower**
2nd
Chief Revenue Officer at R1D Media
Group formerly RightT Data
Denver, Colorado, United States

# EXHIBIT H



UNITED STATES OF AMERICA
## FEDERAL TRADE COMMISSION
WASHINGTON, D.C. 20580

Division of Advertising Practices
Bureau of Consumer Protection
~
Mary Koelbel Engle
Associate Director

July 21, 2004

**Via Federal Express**
Steven P. Erlich
4051 N. 41st Ct.
Hollywood, FL 33021

      Re:    Cardwish Electronic Greeting Cards and Promotional Email Service

Dear Mr. Erlich:

      As you know, the staff of the Federal Trade Commission conducted an investigation into possible violations of Section 5 of the Federal Trade Commission Act by you in connection with the Cardwish electronic greeting card service and associated unsolicited commercial emails.

      The staff's inquiry addressed whether you were involved in transmitting unsolicited email messages that falsely informed consumers they had received personal electronic greeting cards via Cardwish and enrolling, without notification, consumers seeking to access such cards in a promotional email service. The staff's inquiry also encompassed the ability of consumers to unsubscribe from the promotional email service. The staff has decided to close its investigation into whether you violated Section 5 of the FTC Act.

      As you may know, Congress recently enacted the Controlling the Assault of Non-Solicited Pornography and Marketing Act of 2003 ("CAN-SPAM Act"), 15 U.S.C. §§ 7701, *et seq*. The Commission staff believes that the conduct we investigated would violate the CAN-SPAM Act, except that the conduct appears to have ceased before January 1, 2004, the effective date of the Act. Engaging in the same or similar conduct in the future could violate the CAN-SPAM Act and result in the imposition of civil and criminal penalties.

      The staff's decision not to recommend enforcement action against you under Section 5 of the FTC Act and to close this investigation is not to be construed as a determination that a violation may not have occurred, just as the pendency of an investigation should not be construed as a determination that a violation has occurred. The staff will continue to investigate possible

Steven P. Erlich
July 21, 2004
Page 2

future violations of Section 5 of the FTC Act and the CAN-SPAM Act.  The Commission
reserves the right to take such further action as the public interest may require.

Very truly yours,

Mary K. Engle
Associate Director for Advertising Practices

# EXHIBIT I



Department of State  /  Division of Corporations  /  Search Records  /  Detail By Document Number  /

## Detail by Entity Name

Foreign Limited Liability Company
NATIONAL INSURANCE USA GROUP LLC

**Filing Information**

| | |
|---|---|
| **Document Number** | M18000008446 |
| **FEI/EIN Number** | 83-1088932 |
| **Date Filed** | 09/10/2018 |
| **State** | WI |
| **Status** | ACTIVE |

**Principal Address**

1039 WEST MASON STREET
GREEN BAY, WI 54303

**Mailing Address**

800 E CYPRESS CREEK RD, SUITE 401
FORT LAUDERDALE, FL 33343-522

**Registered Agent Name & Address**

ERLICH, STEVE
4107 M 48TH TER
HOLLYWOOD, FL 33021

**Authorized Person(s) Detail**

**Name & Address**

Title MGR

ARCALLAN, APOLLO
299 MAIN ST, SUITE 1300
SALT LAKE CITY, UT 84111

**Annual Reports**

**No Annual Reports Filed**

**Document Images**

09/10/2018 — Foreign Limited       View image in PDF format